211 P.3d 1272

William **RITCHIE**, surviving father of Jeremy Ritchie, on behalf of himself and Darlene Ritchie, the surviving mother of Jeremy Ritchie; and Korbin Underwood, the surviving child of Jeremy Ritchie, Plaintiffs/Appellees,

v.

Scott A. **KRASNER**, M.D. and Teri Lee Krasner, husband and wife; Scott A. Krasner, M.D., P.C., Defendants/Appellants.

No. 1 CA–CV 08–0099.

Court of Appeals of Arizona, Division 1, Department D.

April 21, 2009.

---

Law Offices of Richard W. Shapiro, P.L.C. by Richard W. Shapiro, and Valder Law Offices, P.C. by Michael J. Valder, Phoenix, Attorneys for Plaintiffs/Appellees.

Kunz Plitt Hyland Demlong & Kleifield by Steven Plitt, Daniel Maldonado, Phoenix, Attorneys for Defendants/Appellants.

## OPINION

IRVINE, Judge.

¶ 1 Dr. Scott A. Krasner, Terri Lee Krasner, and Scott A. Krasner, M.D., P.C. (together, "Krasner") appeal the jury verdict in favor of William Ritchie, Darlene Ritchie, and Korbin Underwood (together, "Ritchies"). Krasner raises several issues on appeal. We hold that, even absent a formal doctor-patient relationship, a doctor conducting an Independent Medical Examination

("IME") owes a duty of reasonable care to his or her patient. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶ 2 This appeal arises from a jury verdict that found Krasner liable for medical malpractice and the wrongful death of Jeremy Ritchie ("Jeremy"). The case involved several defendants, but we will limit our discussion to the relevant facts regarding Dr. Krasner and his appeal.

¶ 3 Jeremy was the father of Korbin and the son of William and Darlene Ritchie. In April of 2000, Jeremy injured his back while at work. He sustained a bruised spinal cord that caused swelling and compression of the cervical spinal cord. Jeremy felt pain and numbness consistent with the injury and sought treatment within two days of the incident.

¶ 4 Jeremy reported his symptoms to Dr. Robinson at HealthSouth Occupational Medicine, but Jeremy disagreed with Dr. Robinson's diagnosis and next went to Emergency Chiropractic. The chiropractors recommended to Paula Insurance ("Paula"), Jeremy's worker's compensation carrier, that he visit a specialist to evaluate his symptoms. The carrier retained Dr. Krasner to perform an IME. In its request to Krasner, Paula described Jeremy's injury as "a cervical and lumbar strain as a result of [a workplace] accident.... Ritchie complained of stiffness and pain in his neck and lower back, tingling in fingers, arms and legs. He was diagnosed with cervical and lumbar strains." Paula asked Dr. Krasner to conduct the evaluation and answer the following questions:

1. Please describe the findings, diagnosis, prognosis and their relationship to the injury of 04/11/00?

2. Do you feel Mr. Ritchie's current symptoms exacerbated a pre-existing back condition? If so, do you feel he is now at a pre-injury status?

3. If not, to what extent do you feel his current symptomatology is attributable to the 04/11/00 industrial incident, and what treatment do you recommend?

4. Do you feel he is capable of regular work? If not, can he perform light work? Please list the restrictions.

¶ 5 Jeremy signed a notice prior to his examination. It stated, "It is very important that you realize that no Doctor/Patient relationship exists between you and Dr. Krasner.... This is done to insure that all findings will be neutral, and that the evaluators are completely independent and not involved in your disability claim or source." Krasner examined him, ordered and reviewed an MRI of the lumbar spine, and reported to Paula that Jeremy's "injury is stationary," "[t]here is no indication for supportive care," and "[t]here is no indication for any work restrictions ... and I feel he is medically able to perform unrestricted work." In reliance on Dr. Krasner's report, Paula terminated Jeremy's benefits. In an affidavit, Jeremy stated: "I was advised that my condition was stable, that I did not need further medical treatment, and that I could go back to work without restriction...."

¶ 6 Jeremy's condition continued to deteriorate and he sought further treatment. He did not qualify for the Arizona Health Care Cost Containment System ("AHCCCS") coverage because he earned too much money during the previous year. Eventually, Jeremy did qualify for AHCCCS and saw Dr. Solomon, a neurologist. She diagnosed Jeremy with a "cervical spinal cord compression and ordered immediate spinal cord surgery." The surgery halted further deterioration of Jeremy's spinal cord, but "during the eight months before Jeremy Ritchie's spinal cord decompression surgery, the undiagnosed spinal cord compression contributed to an increasing and ongoing injury to Mr. Ritchie's spinal cord," causing part of the cord to die.

¶ 7 Jeremy developed a condition called "central pain syndrome," which caused constant pain and discomfort. Dr. Solomon prescribed Oxycontin and Oxycodone, both narcotics, for the central pain syndrome. She also prescribed medications to aid his sleep and to reduce his nerve and muscle spasms. In April of 2004, Jeremy died of an accidental overdose, characterized as "the synergistic effects of the various medications he was taking for his cervical spinal cord injury."

¶ 8 In December 2002, prior to his death, Jeremy filed a medical malpractice complaint against Dr. Robinson, HealthSouth, Emergency Chiropractic and its treating chiropractors, Dr. Krasner, and other entities. After his death, Jeremy's parents and Korbin amended the complaint to reflect a medical malpractice and wrongful death action.

¶ 9 After Dr. Solomon was added as a defendant and several other defendants were dismissed, the case went to trial. The trial court made the decision to exclude evidence regarding Jeremy's history of alcoholism and felony convictions, but allowed evidence of Jeremy's financial condition and his loss of worker's compensation. The court also refused to give a jury instruction on intervening/superseding cause, opting instead to use the standard Revised Arizona Jury Instructions ("RAJI") regarding causation. During the Ritchies' closing argument, counsel asked the jury to find no liability for Dr. Solomon. Ultimately, the jury returned a verdict in favor of the Ritchies for $5 million. It found Krasner 28.5% at fault, Emergency Chiropractic 37% at fault, Dr. Howe of Emergency Chiropractic 28.5% at fault, and Dr. Robinson 6% at fault. The jury assigned no fault to Jeremy or Dr. Solomon. From this verdict, Krasner appeals.

¶ 10 We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12–2101(B) and (D) (2003).

## DISCUSSION

### I. Krasner's Legal Duty

¶ 11 In order to maintain a negligence claim, "a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 9, 150 P.3d 228, 230 (2007) (hereinafter, "*Gipson II* "). The threshold issue is whether Krasner had a legal duty to protect Jeremy from injury or harm. *Stanley v. McCarver*, 208 Ariz. 219, 221, ¶ 5, 92 P.3d 849, 851 (2004). The existence of a duty is generally a question of law, and we exam-

ine whether a duty exists de novo. *Id.*; *Diggs v. Ariz. Cardiologists*, 198 Ariz. 198, 200, ¶ 11, 8 P.3d 386, 388 (App.2000). The other elements of negligence are factual issues, and are generally within the province of the jury. *Gipson II*, 214 Ariz. at 143, ¶ 9, 150 P.3d at 230. We review the evidence in the light most favorable to upholding the jury verdict. *Hutcherson v. City of Phoenix*, 192 Ariz. 51, 53, ¶ 13, 961 P.2d 449, 451 (1998). We will uphold the verdict if substantial evidence exists that permits reasonable jurors to reach the result. *Id.*

### A. An IME Doctor's Duty

¶ 12 A duty may arise even in the absence of a formal relationship. *Stanley*, 208 Ariz. at 221, ¶ 7, 92 P.3d at 851. It can arise from a relationship between the parties, a contractual relationship, or any number of other types of contacts. *Id.* "A special or direct relationship, however, is not essential in order for there to be a duty of care." *Gipson II*, 214 Ariz. at 145, ¶ 18, 150 P.3d at 232.

¶ 13 Krasner places great reliance on *Hafner v. Beck*, 185 Ariz. 389, 916 P.2d 1105 (App.1995). In *Hafner*, Dr. Beck conducted an independent psychological examination of the plaintiff at the request of the plaintiff's workers' compensation carrier. *Id.* at 390, 916 P.2d at 1106. Dr. Beck reported that the plaintiff "required no further psychological treatment and had no psychological impairment related to her industrial accident." *Id.* Because of his conclusion, the plaintiff lost compensation benefits and psychotherapy treatment for several months. *Id.* *Hafner* applied the traditional rule that a duty arises only when a doctor-patient relationship exists. *Id.* at 391, 916 P.2d at 1107. As we stated in *Diggs*, however, courts should narrowly construe *Hafner's* assertion that a duty arises only when a formal doctor-patient relationship exists. *Diggs*, 198 Ariz. at 201, ¶ 16, 8 P.3d at 389. A doctor has no duty to the patient only when the doctor has no intent "to treat, care for or otherwise benefit the employee." *Hafner*, 185 Ariz. at 392, 916 P.2d at 1108. *Stanley* acknowledged, however, that a formal relationship is not the only

source of a doctor's duty toward a patient. *Stanley*, 208 Ariz. at 221, ¶ 7, 92 P.3d at 851.

■ ¶ 14 *Stanley* provides a number of factors that courts may consider when determining the existence of a duty. *Id.* at 223, ¶ 12, 92 P.3d at 853. These include,

> whether the doctor was in a unique position to prevent harm, the burden of preventing harm, whether the plaintiff relied upon the doctor's diagnosis or interpretation, the closeness of the connection between the defendant's conduct and the injury suffered, the degree of certainty that the plaintiff has suffered or will suffer harm, the skill or special reputation of the actors, and public policy.

*Id.* In *Stanley*, Dr. McCarver conducted a pre-employment tuberculosis screening of the plaintiff on behalf of the plaintiff's prospective employer. *Id.* at 220, ¶ 2, 92 P.3d at 850. Dr. McCarver found several abnormalities in the plaintiff's chest, but did not report these to the plaintiff. *Id.* Ten months later, the plaintiff was diagnosed with lung cancer. *Id.*

¶ 15 In applying the duty factors, the supreme court acknowledged that Dr. McCarver and the plaintiff did not have a formal relationship. *Id.* at 223, ¶ 13, 92 P.3d at 853. The doctor did, however, agree to examine the plaintiff's "confidential medical record, her x-ray, and accurately report the results to" her prospective employer. *Id.* In doing so, "Dr. McCarver placed himself in a unique position to prevent future harm to Ms. Stanley." *Id.* at ¶ 14.

¶ 16 *Stanley* noted that when a patient places "oneself in the hands of a medical professional, even at the request of one's employer or insurer, one may have a reasonable expectation that the 'expert will warn of any incidental dangers of which he is cognizant due to his peculiar knowledge of his specialization.'" *Id.* at 223, ¶ 11, 92 P.3d at 853 (quoting *Green v. Walker*, 910 F.2d 291, 296 (5th Cir.1990) and *Am. Mfrs. Mut. Ins. Co. v. United Gas Corp.*, 159 So.2d 592, 595 (La.App.1964)).

■ ¶ 17 Here, Paula paid Krasner to render services relating to Jeremy. Krasner conducted the IME for Paula to determine whether Jeremy was injured on the job, to assess his current conditions, to evaluate treatment options, and to assist in determining whether he was entitled to compensation and treatment. Krasner reviewed Jeremy's records, conducted an examination, ordered and reviewed an MRI of Jeremy's lumbar spine, and rendered a report that both Paula and Jeremy relied upon.

■ ¶ 18 Krasner contends that an IME doctor has no duty "to perform a thorough enough [IME] examination to discover every condition that could possibly be harmful to a patient's health, when the condition that posed a risk to the decedent's health was not discovered during the IME." We agree. Nevertheless, an IME doctor has a duty "to conform to the legal standard of reasonable conduct in the light of the apparent risk." *Stanley*, 208 Ariz. at 224, ¶ 16, 92 P.3d at 854 (citing William L. Prosser ("Prosser"), Handbook of the Law of Torts § 53, at 324 (4th ed.1971)). In *Stanley*, Dr. McCarver "assumed a duty to conform to the legal standard of care for one with his skill, training, and knowledge." *Id.* Dr. Krasner assumed the same duty toward Jeremy when he conducted his IME. Given that Dr. Krasner had that duty, whether there was a breach of that duty was a determination left to the jury. *See Gipson II*, 214 Ariz. at 143, ¶ 9, 150 P.3d at 230; *Markowitz v. Ariz. Parks Bd.*, 146 Ariz. 352, 358, 706 P.2d 364, 370 (1985).

¶ 19 We also find Restatement (Second) of Torts ("Restatement") § 324A (1965) relevant to this case. It states, in relevant part:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to third person, or (c) the harm is suffered because of reliance of the other or third person upon the undertaking.

(*See Tollenaar v. Chino Valley School Dist.*, 190 Ariz. 179, 181, 945 P.2d 1310, 1312 (1997)). Both *Stanley* and the Restatement lead us to conclude that Krasner owed Jeremy a duty of care. Krasner rendered services to Jeremy on behalf of Paula. Jeremy stated in his deposition that, "[i]n reliance on Dr. Krasner's findings, I did not obtain additional medical care until several months later." As our supreme court noted in *Stanley:* "we can envision no public benefit in encouraging a doctor who has specific individualized knowledge of an examinee's serious abnormalities to not disclose such information." 208 Ariz. at 223, ¶ 14, 92 P.3d at 853. We too cannot envision a public benefit in encouraging a doctor with specific individualized knowledge not to investigate the symptoms of a cervical spine injury.

¶ 20 We recognize the very real concern that imposing a duty on Krasner to practice reasonable care under the circumstances might create a chilling effect within the IME community. As *Stanley* noted, however, ethical standards govern physicians, and they likely limit "the threatened flood of litigation" to a "trickle." 208 Ariz. at 225, ¶ 20, 92 P.3d at 855. We do not hold that every IME physician has a duty of care in every situation. In this case, Krasner was hired to determine the extent of Jeremy's work-related injury and make treatment recommendations. By agreeing to do so, he assumed a duty to "conform to the legal standard of reasonable conduct in light of the apparent risk." *Id.* at 224, ¶ 16, 92 P.3d at 854 (quoting Prosser, § 53 at 324). Therefore, we hold the trial court correctly held that Krasner owed a duty of reasonable care to Jeremy.

## B. Krasner's Limited Liability Agreement

■■■■ ¶ 21 Krasner argues that the trial court should have allowed the jury to see its limited liability agreement ("Agreement") with Jeremy. Arizona Rule of Evidence ("Rule") 403 states that, "[a]lthough relevant, evidence may be excluded … by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ariz. R. Evid. 403. The Agreement states:

It is very important that you realize that no Doctor/Patient relationship exists between you and Dr. Krasner. Because of this, the results of this evaluation will not be given to you or to anyone that you may request to receive them. This is done to insure that all findings will be neutral, and that the evaluators are completely independent and not involved in your disability claim or source....

We recognize that "doctors may deal with [the] issue [of potential lawsuits] as a matter of contract. They may, for example, require x-ray subjects to consent to having the results reported only to the employers." *Stanley*, 208 Ariz. at 225, ¶ 20, 92 P.3d at 855. Krasner did precisely what *Stanley* suggested, stating he would not provide Jeremy the evaluation results. We do not, however, read the agreement as eliminating Krasner's duty to do his job in a reasonable manner.

¶ 22 As we stated above, a formal doctor-patient relationship need not exist for a duty of reasonable care to arise. Although the agreement states that Jeremy does not share a formal or traditional doctor-patient relationship with Dr. Krasner, this does not free Krasner from a duty of care. As the court noted after trial, because a formal doctor-patient relationship is not necessary for a duty to exist, "the disclaimer in the [Agreement] is simply irrelevant. That Defendant Krasner saw Jeremy, not as a treating physician, but solely in the context of an IME, was made abundantly [clear] in the presentation of evidence and in closing arguments, and the Court is convinced that the jury understood the distinction." Therefore, we hold the trial court founded its decision to exclude the Agreement on reason and law.

## C. Proximate Cause

■■■■ ¶ 23 Courts generally leave the issue of proximate cause to the jury. *Christy v. Baker*, 7 Ariz.App. 354, 358, 439 P.2d 517, 521 (1968). The plaintiff does not need "to introduce evidence to establish that the negligence resulted in the injury or the death, but simply that the negligence increased the risk of injury or death. The step from increased risk to [the probability of] causation is one for the jury to make." *Thompson v. Sun*

*City Comm. Hosp., Inc.* 141 Ariz. 597, 607, 688 P.2d 605, 615 (1984) (quoting *Herskovits v. Group Health Coop. of Puget Sound,* 99 Wash.2d 609, 664 P.2d 474, 478 (1983)). The plaintiff, however, must present enough evidence for a jury reasonably to infer "the negligent conduct on the part of the defendant was a proximate cause of plaintiff's injuries." *Baker,* 7 Ariz.App. at 358, 439 P.2d at 521. This evidence must provide support for the jury's "conclusion that it is more likely than not that [the] defendant's conduct was a substantial factor in bringing about the result." *Wisener v. State,* 123 Ariz. 148, 150, 598 P.2d 511, 513 (1979). A jury may find proximate cause between the defendant's act and the plaintiff's injury if the plaintiff's injury was a foreseeable consequence of the act. *See* Dan B. Dobbs, The Law of Torts 447–53 (West Group 2000).

¶ 24 Krasner argues that a later efficient intervening act superseded any harm that resulted from his act of diagnosing Jeremy, thereby shielding him from any responsibility for Jeremy's harm. "An 'efficient intervening cause' is an independent cause that occurs between the original act or omission and the final harm and is necessary in bringing about that harm." *Barrett v. Harris,* 207 Ariz. 374, 378, ¶ 11, 86 P.3d 954, 958 (App.2004) (citing *Robertson v. Sixpence Inns of Am. Inc.,* 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990)).

¶ 25 Krasner claims that "[i]t was not foreseeable that Mr. Ritchie would die of a drug overdose four years" after Dr. Krasner saw him. He further claims that prescriptions of Oxycontin and Oxycodone prescribed by a Dr. Christopher and by Dr. Solomon acted as intervening causes in Jeremy's death. These were intervening acts, but Krasner can be "relieved from liability for the final result when, and only when, an intervening act of another was unforeseeable by a reasonable person in the position of the original actor *and* when, looking backward, after the event, the intervening act appears extraordinary." *Gipson v. Kasey,* 212 Ariz. 235, 242, ¶ 31, 129 P.3d 957, 964 (App.2006) (hereinafter, "*Gipson I* ") *(vacated in part by Gipson II,* 214 Ariz. at 147, ¶ 32, 150 P.3d at 234, as to duty)

(quoting *Ontiveros v. Borak,* 136 Ariz. 500, 506, 667 P.2d 200, 206 (1983)).

¶ 26 In *Gipson I,* the defendant gave the decedent's girlfriend, Watters, eight pills of Oxycontin and Oxycodone for recreational purposes. *Id.* at 237, ¶ 4, 129 P.3d at 959. The defendant thought that Followill, the decedent, was "too stupid and immature to take drugs like that," but also knew that Watters was likely to give him the pills. *Id.* at ¶¶ 4–5. Followill indeed took the pills from Watters, and died overnight from a lethal combination of alcohol and Oxycodone. *Id.* at 237–38, ¶¶ 5–8, 129 P.3d at 959–60. The court stated:

> Thus, in evaluating whether the two intervening acts were unforeseeable and extraordinary, we must consider whether Watters' act of giving the pills to Followill might "reasonably be expected to occur now and then," and whether Followill's act of ingesting some or all of the pills, along with the alcohol, might similarly be expected to occur now and then.

*Id.* at 243, ¶ 34, 129 P.3d at 965 (quoting *Tellez v. Saban,* 188 Ariz. 165, 172, 933 P.2d 1233, 1240 (App.1996)). The court declared that Watters' and Followill's intervening acts were "not so clearly unforeseeable that we can declare as a matter of law that any fault on the part of Kasey was not the proximate cause of Followill's death." *Id.* at ¶ 34.

¶ 27 Foreseeability is not a factor when deciding whether a duty exists. *Gipson II,* 214 Ariz. at 144, ¶ 15, 150 P.3d at 231. Determining whether a certain result is foreseeable requires a factual analysis that is best left to the jury. Juries should engage in a foreseeability analysis to help determine the issues of breach and causation. *Id.* at ¶ 16. It is essential for both courts and parties not to conflate the legal determination of duty and the factual determinations of standard of care, breach, and causation. If we were to use foreseeability as a factor to help determine the existence of duty, we would risk "obscur[ing] the factors that actually guide courts in recognizing duties for purposes of negligence liability." *Id.* Limiting foreseeability to the factual analysis "recognizes the jury's role as factfinder and requires courts to articulate clearly the rea-

sons, other than foreseeability, that might support duty or no-duty determinations." *Id.* at ¶ 17.

¶ 28 Based on the record in this case, we cannot find that the jury erred in finding Krasner's misdiagnosis was partially the proximate cause of Jeremy's injury, and ultimately, his death. The jury heard testimony from expert witnesses and reviewed volumes of evidence. Based on this, it reasonably could have found it foreseeable that Krasner's report prevented Jeremy from seeking treatment either because he relied on Krasner's report or because Paula relied on the report, causing it to terminate Jeremy's workers' compensation coverage. Further, the jury could have found Jeremy's physical deterioration and reliance on medication foreseeable.

¶ 29 Finally, section 457 of the Restatement holds that, "If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner." "Absent law to the contrary, we look to the Restatement for guidance." *Barrett,* 207 Ariz. at 379, ¶ 15, 86 P.3d at 959; *see also Webster v. Culbertson,* 158 Ariz. 159, 162, 761 P.2d 1063, 1066 (1988). We find the Restatement instructive in this case and find the jury had substantial evidence from which to determine that Krasner's act was the proximate cause of Jeremy's injury.

## II. The Intervening/Superseding Cause Instruction

¶ 30 Krasner argues that the standard RAJI medical malpractice instructions were insufficient, and the trial court should have included instructions on intervening/superseding cause. "We review a trial court's denial of a requested jury instruction for an abuse of discretion." *State v. Brown,* 204 Ariz. 405, 407–08, ¶ 7, 64 P.3d 847, 849–50 (App.2003). "A trial court must give a requested instruction if (1) the evidence presented supports the instruction, (2) the instruction is proper under the law, and (3) the

instruction pertains to an important issue that is not dealt with in any other instruction." *Czarnecki v. Volkswagen of Am.,* 172 Ariz. 408, 411, 837 P.2d 1143, 1146 (App. 1991).

¶ 31 The Ritchies contend that the court dealt with the issues in the jury instructions they provided. Although a "party is entitled to an instruction on any theory of the case reasonably supported by the evidence," the court does not need to provide additional, more specific instructions "that do nothing more than reiterate or enlarge the instructions in defendant's language" when the court provides the applicable law to the jury. *State v. Bolton,* 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995); *see State v. Shumway,* 137 Ariz. 585, 588, 672 P.2d 929, 932 (1983).

¶ 32 Emergency Chiropractic and Dr. Howe proposed two jury instructions on the topic. The first stated: "An 'efficient intervening cause' is an independent cause that occurs between the original act or omission and the final harm and is necessary in bringing about that harm." The second stated, "An intervening cause breaks the chain of proximate causation if it is a superseding cause. An intervening cause becomes a superseding cause, thereby relieving the defendant of liability for the original negligent conduct, when the intervening force was unforeseeable and may be described, with the benefit of hindsight, as extraordinary." The court rejected both proposed instructions, electing instead to instruct:

> Before you can find any person at fault, you must find that person's negligence was a cause of Jeremy Ritchie's death and plaintiff's injury.
>
> Negligence causes an injury if it helps produce the injury, and if the injury would not have happened without the negligence. There may be more than one cause of an injury.
>
> On the claim of fault for medical negligence, plaintiff has the burden of proving:
>
> 1. One or more defendants were negligent;
>
> 2. One or more defendant's negligence was a cause of Jeremy Ritchie's death;

3. One or more defendant's negligence was a cause of injury to plaintiff;

4. Plaintiff's damages.

Several defense attorneys, along with the Ritchies' lawyers, argued their position on the proposed instructions to the trial judge. In deciding against the proposed intervening/superseding cause instructions, the court properly found the analysis of the proposed instructions, taken from *Gipson I*, "relates to whether or not causation was a jury question, not whether it's properly the subject of a jury instruction," and the standard RAJI instructions sufficient. We find the court did not abuse its discretion when it used the RAJI medical malpractice instructions on causation, instead of the proposed intervening/superseding cause instructions.

## III. The Jury's Apportionment of Fault and Amount of Verdict

¶ 33 Krasner contends that the jury inappropriately apportioned fault among the parties as a direct result of the trial court's errors. Krasner further contends that the jury's verdict was excessive and the court should have granted a new trial or reduced the amount of the verdict. We review the evidence following a jury trial in the light most favorable to upholding the verdict. *Hutcherson*, 192 Ariz. at 53, ¶ 13, 961 P.2d at 451. We will uphold the verdict if substantial evidence exists that permits reasonable jurors to reach the result. *Id.*

### A. Apportionment of Fault

¶ 34 In Arizona, if a jury applies the defense of contributory negligence in its verdict, "the full damages shall be reduced in proportion to the relative degree of the claimant's fault which is a proximate cause of the injury or death, if any." A.R.S. § 12–2505 (2003). The Arizona Constitution, however, leaves the issue solely within the jury's discretion. Ariz. Const. art. 18, § 5. ("[C]ontributory negligence ... shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury."). In a negligence action such as this, the jury not only has "the right to determine the facts, but to apply or not, as the jury sees fit, the law of contributory negligence as a defense."

*Gunnell v. Ariz. Pub. Serv. Co.*, 202 Ariz. 388, 394, ¶ 23, 46 P.3d 399, 405 (2002) (quoting *Heimke v. Munoz*, 106 Ariz. 26, 28, 470 P.2d 107, 109 (1970) (*overruled on other grounds by Jurek v. Jurek*, 124 Ariz. 596, 606 P.2d 812 (1980))).

¶ 35 At trial, Krasner vigorously argued that Dr. Solomon and Jeremy were themselves negligent and that such negligence was a cause of Jeremy's injury and death. Krasner refers to Jeremy's cause of death, accidental overdose, and Dr. Solomon's role in prescribing Jeremy's medication as evidence of negligence. The jury decided not to apportion negligence to Jeremy or to Dr. Solomon. It assigned 28.5% of the fault to Krasner, 65.5% of the fault to Dr. Howe and Emergency Chiropractic, and the remaining 6% to Dr. Robinson. As the court noted after the verdict, "[t]he jury could reasonably have found that Dr. Krasner's failure to properly diagnose Jeremy's spinal injury, despite being called in precisely because of his experience, was as responsible in its own way as that of the chiropractor, whose medical competence is understood to be more limited in scope." We agree.

### B. Amount of Verdict

¶ 36 Krasner argues that the trial court's refusal to instruct the jury on intervening/superseding cause, as well as its evidentiary rulings, caused the jury to base its decision "upon emotion, passion and/or prejudice as opposed to the evidence and the light of reason." Similar to apportionment of fault, "[t]he amount of damages is a question particularly within the province of the jury." *Frontier Motors, Inc. v. Horrall*, 17 Ariz. App. 198, 200, 496 P.2d 624, 626 (1972). We will not disturb a jury's verdict "unless it can be said that the verdict is so far inadequate or so excessive as to be without support in the evidence, or it must appear that the verdict was the result of some extrinsic consideration, such as bias, passion, or prejudice on the part of the jury." *Meyer v. Ricklick*, 99 Ariz. 355, 357, 409 P.2d 280, 281 (1966). A court will not intervene when there is conflicting evidence. Instead, both the trial court and the court of appeals defer to "a

jury's good sense and unbiased judgment." *Id.* at 358, 409 P.2d at 282.

¶ 37 In the Ritchies' closing arguments, their counsel suggested that the jury should award up to $2 million in damages to Korbin Underwood, and up to $1 million each for William and Darlene Ritchie. Counsel told the jury that the amount they could award, however, was "completely within your discretion.... You may think that you should award more, or you should award less. It's completely within your discretion." Ultimately, the jury awarded a total of $5 million to the plaintiffs, with $3 million awarded to Korbin, and $1 million each to William and Darlene.

¶ 38 After the trial, the court agreed that the verdict was high, but refused to grant Krasner a new trial or a remittitur. We find no abuse of discretion and also find that the evidence reasonably supported the jury's award of damages to the Ritchies.

## IV. Evidentiary Issues

¶ 39 Krasner claims the trial court erred by excluding evidence of Jeremy's alcohol use and character evidence, and by allowing in evidence of Jeremy's financial condition and the loss of his workers' compensation benefits. These claims involve Rules of Evidence 403, 404, and 405. We will affirm a trial court's admission or exclusion of evidence unless there is a clear abuse of discretion or legal error, and prejudice results. *Lohmeier v. Hammer,* 214 Ariz. 57, 60, ¶ 6, 148 P.3d 101, 104 (App.2006).

### A. Jeremy's Alcoholism

¶ 40 Krasner claims evidence of Jeremy's prior alcohol use was relevant to the issues of liability, causation, and damages. Prior to trial, the Ritchies moved to exclude evidence relating to Jeremy's alcohol and drug use. They argued that the defendants could not introduce evidence of alcohol or drug misuse through expert opinion, and that the rules of evidence precluded the admission of this evidence. Courts may exclude evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ariz.R.Evid. 403. The trial court thought the defendants were attempting to introduce some of the evidence to show Jeremy's bad character. "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Ariz.R.Evid. 404(a); *see Henson v. Triumph Trucking, Inc.,* 180 Ariz. 305, 306–07, 884 P.2d 191, 192–93 (App.1994).

¶ 41 Krasner relies on *Sheehan v. Pima County* to support his argument that evidence of drug use and addiction is relevant to a damages award. 135 Ariz. 235, 660 P.2d 486 (App.1982). In *Sheehan,* a wrongful death case, the court stated the general rule for considering a damages award allows a jury to consider the "decedent's characteristics and habits including his general ability, other occupations he was qualified to fulfill, his industriousness, disposition to earn, intelligence, manner of living, sobriety or intemperance, frugality or lavishness, and other personal characteristics that are of assistance in securing business or earning money." *Id.* at 239, 660 P.2d at 490. The issue in *Sheehan* appears to concern economic loss, an issue the Ritchies abandoned to avoid opening the door for the admission of character evidence. Because of this, the court applied Rules 403 and 404.

¶ 42 The trial court excluded some of Jeremy's history of alcohol use and precluded Jeremy's psychologist from testifying about his addiction history. The court told counsel for the defendants, "you can come and say whether or not there was a predisposition [to abusing pain drugs], assuming the experts can provide adequate foundation. But you can't go into the specifics. Alcoholism, illegal drug use, anything of that nature." The court limited the testimony and evidence because it was "too unclear," "too remote," and "too prejudicial." Additionally, it noted that many of the documents the defendants tried to admit lacked proper foundation.

¶ 43 The court permitted limited expert testimony on Jeremy's prescription drug use. On direct examination, defense counsel asked whether, "to a reasonable degree of medical

probability that Mr. Ritchie caused his own death," to which the medical expert replied, "Yes." The expert further stated that Jeremy's death was, "an accident in the terms that it's not a homicide or a suicide, but it's a very predictable accident. Someone who has [sic] repeatedly misusing and abusing their drugs is likely to have an accident.... He continually did not follow directions. He continually and progressively abused and misused more and more of his medication until he took enough medication that it caused his death."

¶ 44 The trial court ruled that any introduction of Jeremy's alleged alcoholism would have been highly prejudicial. The court defended its decision to exclude the evidence because it allowed "Defendants to present evidence that Jeremy was predisposed to abuse of pain medications, which would have included analysis of his history by their experts as a basis for their opinions, as long as alcoholism was not disclosed to the jury." We agree, and find that the trial court did not abuse its discretion by excluding evidence regarding Jeremy's past alcohol use.

### B. Jeremy's Relationship with Korbin's Mother and his Incarceration

¶ 45 Krasner next argues that the trial court should have admitted character evidence relating to Jeremy's relationship with Korbin's mother and Jeremy's felony convictions. Contrary to Krasner's assertion, the court allowed testimonial evidence of Jeremy's abusive relationship with Korbin's mother. The court allowed defense counsel to question Korbin's mother regarding two incidents of domestic violence so long as they avoided discussing that the police were called. It found that "because of the hearsay [in the police reports] and lack of foundation, essentially lack of probative value, references to the police report, or the fact the police were called out to a domestic-violence incident, or any references in that regard are not to be made or asked." We find the trial court did not abuse its discretion by excluding the police reports because they were prejudicial, lacked foundation, and were subject to the hearsay rule.

¶ 46 Further, the court properly precluded the use of Jeremy's prior felony conviction. Rule 609 permits counsel to introduce evidence of a conviction to attack a witness's credibility after applying a balancing test to determine if the probative value of the conviction outweighs its prejudicial effect. Ariz.R.Evid. 609(a). "The trial court has wide discretion in deciding whether to exclude evidence of prior convictions because its prejudicial effect is greater than the probativeness on lack of credibility, and the exercise of this discretion should not be disturbed absent a clear showing of abuse." *Blankinship v. Duarte*, 137 Ariz. 217, 219, 669 P.2d 994, 996 (App.1983). As the court noted after the trial, the conviction "could be used solely to attack his credibility *as a witness*, not as a patient or a claimant." The defendants failed to timely raise Jeremy's conviction to attack his credibility during his deposition, the only time Jeremy served as a witness. The court did not abuse its discretion by excluding Jeremy's felony conviction.

### C. Financial Condition and Loss of Benefits

¶ 47 Krasner also argues the court should have excluded evidence relating to Jeremy's financial condition and his workers' compensation benefits. Ordinarily, courts exclude evidence of the existence or lack of insurance on policy grounds. *Foulk v. Kotz*, 138 Ariz. 159, 161, 673 P.2d 799, 801 (App.1983). Nevertheless, we do not presume prejudice even when a court improperly admits insurance-related evidence. *Cervantes v. Rijlaarsdam*, 190 Ariz. 396, 398, 949 P.2d 56, 58 (App.1997).

¶ 48 Krasner asserts that discussion of Jeremy's financial condition and his lack of benefits was both irrelevant under Rule 401 and relevant, but overly prejudicial, under Rule 403. The court realized the evidence risked prejudicing the jury, but it balanced the prejudice against the probative value and determined that because Jeremy's ability to afford treatment was an open subject, it would allow the Ritchies to present the evidence.

¶ 49 The court allowed the Ritchies to present evidence of Jeremy's financial condi-

tion only to rebut the fact that he did not receive continuing care between when he saw Dr. Krasner and the time he resumed treatment. The injection of this topic in questioning and testimony was not overly prejudicial and the trial court did not abuse its discretion by allowing its limited use.

## V. Misconduct of the Ritchies' Attorney in Closing Arguments

¶ 50 In his closing argument, counsel for the Ritchies told the jury that, in his opinion, Dr. Solomon did not fall below the standard of care. "I think on the verdict form you ought to put a zero next to her name."

¶ 51 Counsel made no objection to the statement at trial. Post-trial, Krasner moved for a new trial and now argues the court erred in not granting one because of the Ritchie counsel's inconsistent positions. In fact, none of the attorneys for the defendants objected at any point during the Ritchies' closing argument. Generally, counsel's failure to object to the argument at trial waives the issue on appeal. *Monaco v. HealthPartners of S. Ariz.*, 196 Ariz. 299, 304–05 n. 2, ¶¶ 16, 18, 995 P.2d 735, 740–41 n. 2 (App.1999); *Grant v. Ariz. Pub. Serv. Co.*, 133 Ariz. 434, 451, 652 P.2d 507, 524 (1982). Waiver does not apply when it appears "that the improper conduct of counsel actually influenced the verdict. The trial judge is in the best position to determine this...." *Anderson Aviation Sales Co., Inc. v. Perez*, 19 Ariz.App. 422, 429, 508 P.2d 87, 94 (1973). We will not overturn a trial court's decision absent an abuse of discretion. *Id.*

¶ 52 In *Anderson*, a wrongful death action, the plaintiff's attorney made an improper statement about the defendant and the strength of the defendant's case. The court interrupted, and admonished the jury to disregard the attorney's remarks. *Id.* At the close of the case, the trial court also gave "the stock instruction that arguments and comments of counsel are not to be considered as evidence in the case." *Id.* Similarly, in the case at bar, the court instructed the jury:

The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case:

Statements and arguments of the attorneys, questions and objections of the attorneys....

....

In the opening statements and closing arguments the lawyers have talked to you or will talk to you about the law and the evidence. What the lawyers said or say is not evidence, but it may help you to understand the law and the evidence.

We will grant a new trial because of attorney misconduct in only the most serious cases in order to prevent a miscarriage of justice. *Id.* The trial judge is in the best position to "decide whether the misconduct materially affected the rights of the aggrieved party." *Leavy v. Parsell*, 188 Ariz. 69, 72, 932 P.2d 1340, 1343 (1997); *Grant*, 133 Ariz. at 454, 652 P.2d at 527.

¶ 53 The misconduct found in the cases Krasner relies on dealt with evasive and misleading comments to the tribunal and the jury, sham trials, and the improper introduction of evidence. *In re Alcorn*, 202 Ariz. 62, 72–73, ¶¶ 37–38, 41 P.3d 600, 610–11 (2002); *Leavy*, 188 Ariz. at 73, 932 P.2d at 1344; *Taylor v. S. Pac. Transp. Co.*, 130 Ariz. 516, 520, 637 P.2d 726, 730 (1981). The alleged misconduct by the Ritchies' counsel asserted here by Krasner does not approach this level. The Ritchies did not attempt to hide their reluctance in maintaining a claim against Dr. Solomon from the tribunal or the other defendants. Counsel did not raise the issue of Dr. Solomon's failure to maintain her standard of care at any point during his cross-examination of Dr. Solomon. When asked, counsel told the court, "the only reason I brought [Dr. Solomon] in is because these two [defendants] named her as a non-party at fault."

¶ 54 Courts give counsel " 'wide latitude' in closing arguments to 'comment on the evidence and argue all reasonable inferences' from it." *State v. Moody*, 208 Ariz. 424, 464, ¶ 180, 94 P.3d 1119, 1159 (2004) (quoting *State v. McDaniel*, 136 Ariz. 188, 197, 665 P.2d 70, 79 (1983) (*abrogated by State v. Walton*, 159 Ariz. 571, 769 P.2d 1017

(1989))). The trial court properly dealt with this issue at trial. It engaged the parties in an extended discussion after the Ritchies, Dr. Howe and Emergency Chiropractic, and Krasner presented their closing arguments. The court asked the parties, "Why is Dr. Solomon still in this case? [T]here's sufficient evidence in the record for the case to go to the jury as to Dr. Solomon.... [However,] plaintiff's counsel got up in their initial opening and essentially took a position that is entirely inconsistent." The court scolded both parties, stating it was "not real happy" with any of the parties for including Dr. Solomon. The defendants essentially agreed "to stipulate to dismiss" Dr. Solomon, but this occurred after they had already made statements implying she fell below the standard of care and thus allowing the jury to assign her fault.

¶ 55 After the trial, the court wrote it was:

a bit angry that Dr. Solomon had been compelled to participate as a party only to be excused literally at the last moment. That said, this was not a sham trial. Even assuming arguendo that it was, these Defendants were not affected at all. They attacked Dr. Solomon's treatment every bit as vigorously with her as co-defendant as they could have had she been instead an alleged non-party at fault. Had she been named a non-party at fault, Plaintiff would undoubtedly have argued the same way. Had the jury believed Defendants, they could have assigned Dr. Solomon some percentage of fault.

The court also kept Dr. Solomon as a defendant so as not to confuse the jury. It told the parties: "[G]iven how the case has been tried, and where we are at this point, it causes more problems to take her off the verdict form and try to get into this issue of whether the jury can be offered an explanation." Based on the record before use, we find the trial court did not abuse its discretion in making that judgment.

## VI. Statute of Limitations

¶ 56 Krasner alleges the statute of limitations bars the Ritchies' entire case. In Arizona, a medical malpractice claimant has two years to raise a negligence claim before the statute of limitations runs. A.R.S. § 12–542 (2003). Dr. Krasner conducted the IME on June of 2000, and Jeremy did not file his initial suit until December of 2002. Krasner, however, failed to raise this defense prior to judgment. "The statute of limitations is an affirmative defense that is waived unless raised." *Uyleman v. D.S. Rentco*, 194 Ariz. 300, 302, ¶ 10, 981 P.2d 1081, 1083 (App.1999).

¶ 57 Even if Krasner did not waive this defense, Arizona follows the discovery rule. Under this rule, the statute does not begin to run until the plaintiff possesses a minimum knowledge sufficient to recognize that "a wrong occurred and caused injury." *Walk v. Ring*, 202 Ariz. 310, 316, ¶ 22, 44 P.3d 990, 996 (2002) (quoting *Doe v. Roe*, 191 Ariz. 313, 323, ¶ 32, 955 P.2d 951, 961 (1998)). The wrongful death claim arose within two years of the Ritchie s' amended complaint, and there is substantial evidence to support the theory that Jeremy did not have reason to investigate his medical malpractice claim until well within the two-year limitation period. This action was not barred by the statute of limitations.

## VII. Witness Immunity

¶ 58 Krasner alleges any negligent conduct arising from his entire IME with Jeremy is immune from litigation because it is witness testimony, and thus qualifies for absolute immunity. We disagree. In *Todd v. Cox*, a libel action, the court held that a witness has absolute immunity when testifying in a judicial proceeding. 20 Ariz.App. 347, 348, 512 P.2d 1234, 1235 (1973). *Todd* noted, however, that "in order to be privileged the testimony must have some relation to the subject judicial proceeding." *Id.* at 349, 512 P.2d at 1236.

¶ 59 Although we consider workers' compensation hearings that occur before administrative law judges judicial proceedings, the administrative process involved in reviewing a claim for compensation is not. *Ohlmaier v. Indus. Comm'n of Ariz.*, 161 Ariz. 113, 117, 776 P.2d 791, 795 (1989). We refuse to extend immunity beyond statements made in litigation proceedings that "are related to the subject" of the proceed-

ing. *Drummond v. Stahl*, 127 Ariz. 122, 125, 618 P.2d 616, 619 (App.1980). Krasner's conduct and IME report fall outside of the scope of witness immunity. He conducted the IME for the benefit of Paula, not for a judicial proceeding. Krasner cannot insulate himself from liability by donning the cloak of witness immunity.

## VIII. Jury Selection

¶ 60 Finally, Krasner urges us to find Maricopa County's jury selection process unconstitutional because the jury panel was not selected on a county-wide basis. Krasner included this issue in his motion for new trial upon learning that questions had been raised in other cases concerning compliance with the statutory requirements for jury selection. The presiding judge in Maricopa County had assigned Judge William O'Neil of Pinal County to address the issue for several cases. At the request of the defendants, the trial court in this case also transferred the issue to the presiding judge, who in turn combined this issue, but only this issue, before Judge O'Neil in case number CV2206–012150. In doing so the trial court directed the defendants to inform the court in writing of Judge O'Neil's ruling within ten business days of the ruling. After Judge O'Neil ruled against the position advocated by Krasner, Ritchie filed a copy of the ruling with the court in this case, which then entered an order denying the motion for new trial based upon jury selection. Krasner filed a motion for reconsideration from this order, arguing that Judge O'Neil's ruling was being appealed and the court should await the outcome of the appeal before finally ruling on the jury selection issue. The court denied the motion for reconsideration. Krasner's notice of appeal specifically included, among the orders appealed from, the denial of the motion for new trial and the denial of the motion for reconsideration.

¶ 61 Krasner's opening brief includes no arguments regarding the jury selection issue. It simply refers to the appeal from Judge O'Neil's order as pending before this court and asserts that any ruling in that case should apply here. We note, however, that the appeal from Judge O'Neil's order has been dismissed by another panel of this court for lack of jurisdiction. *See In re Jury Selection Process in Maricopa County*, 220 Ariz. 526, 207 P.3d 779 (Ariz.App. 2009). In any event, the jury selection issue was fully disposed of by the trial court in this case. Thus, for us to address it on appeal, Krasner was required to argue it in his brief with appropriate citations to the record and legal authority. He did not do so.

¶ 62 Opening briefs must present and address significant arguments, supported by authority that set forth the appellant's position on the issue in question. *Schabel v. Deer Valley Unified Sch. Dist. No. 97*, 186 Ariz. 161, 167, 920 P.2d 41, 47 (App.1996). Rule 13(a)(6), Arizona Rules of Civil Appellate Procedure, requires the appellant to provide "citations to the authorities, statutes and parts of the record relied on." Failure to do so can constitute abandonment and waiver of that claim. *State v. Moody*, 208 Ariz. 424, 452 n. 9, ¶ 101, 94 P.3d 1119, 1147 n. 9 (2004). The trial court denied Krasner's motion to await the outcome of the appeal from Judge O'Neil's order. Therefore, the issue needed to be specifically raised and addressed in this case. Krasner did not, however, consider the jury selection worthy of an argument supported by authority in his opening brief. Therefore, we deem the issue waived.

¶ 63 Given that there could have been good-faith reliance by Krasner on the pendency of the appeal from Judge O'Neil's ruling, and in the interests of judicial economy, we also note an alternative ground to reject Krasner's appeal of the jury selection issue. A verdict will be reversed for errors in selecting the jury only if a party can "show actual prejudice, i.e., that the jurors who actually served were not fair and impartial." *State v. Morris*, 215 Ariz. 324, 335, ¶ 43, 160 P.3d 203, 214 (2007); *see also Jury Selection Process*, 220 Ariz. at 530–31, ¶¶ 12–13, 207 P.3d at 783–84, 2009 WL 786908, at * 4, ¶¶ 12–13. Nothing in Krasner's motion for new trial addressed actual prejudice regarding the jury in this case. Therefore, Krasner's argument also fails because he has not shown actual prejudice.

**CONCLUSION**

¶ 64 For the foregoing reasons, we affirm.

CONCURRING: PATRICIA A. OROZCO, Presiding Judge, and PETER B. SWANN, Judge.