2011 VT 115

Terrence WHITE, Individually, and as Administrator of Estate of Krystine White, and Pauline Searles v. Mark S. HARRIS, M.D., Nancy Foote, Susan Farrell, Upper Valley Pediatrics, Northeast Kingdom Human Services, Inc., Rita M. Gelsomini Gruber, M.D., Fletcher Allen Health Care, Inc., and Gain Paolo Bentivoglio, M.D.

[36 A.3d 203]

No. 10-246

¶ 1. September 29, 2011. Plaintiffs appeal from a superior court order granting summary judgment to defendant Fletcher Allen Health Care, Inc. in this wrongful death action alleging medical malpractice. This case arises from the suicide of plaintiffs' fourteen-year-old daughter. Plaintiffs sued defendant, which employed a psychiatrist who was briefly involved with decedent's case through a telepsychiatry research study. Plaintiffs argue that summary judgment was improperly granted on the issue of the duty owed to decedent by the psychiatrist. We agree, and thus reverse and remand for additional proceedings.

¶ 2. The record indicates the following. Decedent suffered from ongoing mental health problems. On the recommendation of her case manager, she consulted with defendant's psychiatrist through a telepsychiatry research study he was conducting. As part of the study, plaintiffs and decedent completed pre-assessment documentation, and they participated in a one-time, ninety-minute video-conference session with the psychiatrist in August 2006. Following the session, the participants completed a questionnaire about their reaction to using telemedicine. The psychiatrist later completed a consultation evaluation that described decedent

and the history of her present illness; it also provided the doctor's diagnostic impression of decedent and set forth recommendations for an initial treatment plan. The evaluation specifically stated that, consistent with the telepsychiatry research protocol, no follow-up services would be provided, and no medication prescriptions would be directly provided by the doctor. The report further explained that the recommended treatment plan was to be weighed by decedent's treatment team, including her primary care physician, for possible implementation. After sending his evaluation, the psychiatrist had no further interaction with plaintiffs, decedent, or any member of her treatment team.

¶ 3. On June 10, 2007, decedent committed suicide. An autopsy report indicated that she died from the combined effects of ingesting Propoxyphene, opiates, and Citalopram. The psychiatrist had not prescribed or recommended any of these medications.

¶ 4. In June 2009, plaintiffs filed an amended complaint, alleging that defendant, among eight doctors and medical care providers, treated decedent in a manner that "fell below the standard of care required of reasonably skillful, careful, and prudent professionals," and that decedent died as a proximate result. Defendant moved for summary judgment in December 2009, asserting that its doctor had no duty to decedent when she committed suicide because there was no doctor-patient relationship. Alternatively, defendant argued that any such relationship was formally terminated in writing following their one-time interaction. Defendant acknowledged that if the trial court found that a duty existed, its motion would be premature. The trial court also recognized that the motion came at an early stage in the proceedings, but reasoned that if no duty existed, then no additional discovery to show a breach of that duty would be necessary. Ultimately,

the trial court agreed that the psychiatrist's contact with decedent was "so minimal as to not establish a physician-patient relationship," and consequently found that no duty existed at the time of decedent's death. Even assuming that a doctor-patient relationship was established, the court concluded that it was terminated following the video-conference and, thus, any duty was extinguished by termination of the relationship and no duty existed at the time of decedent's death. The court thus granted defendant's summary judgment motion. This appeal followed.

¶ 5. Plaintiffs argue that the court erred in finding that the doctor owed no duty to decedent. They maintain that the doctor had a duty to exercise reasonable care to protect decedent from the danger she posed to herself, and that the doctor did not effectively terminate the doctor-patient relationship prior to decedent's death.

¶ 6. We review motions for summary judgment de novo, using the same standard of review as the trial court. *Campbell v. Stafford*, 2011 VT 11, ¶ 10, 189 Vt. 567, 15 A.3d 126 (mem.). We afford the nonmoving party "the benefit of all reasonable doubts and inferences," *Doe v. Forrest*, 2004 VT 37, ¶ 9, 176 Vt. 476, 853 A.2d 48, and we will affirm summary judgment orders when there is no genuine issue as to any material fact and a party is entitled to judgment as a matter of law. V.R.C.P. 56(c)(3).

¶ 7. We agree that a duty applies to the service provided. The doctor had a duty of due care in his professional contact with decedent, which was not extinguished by the ministerial act of termination of their professional relationship. See *Endres v. Endres*, 2008 VT 124, ¶ 11, 185 Vt. 63, 968 A.2d 336 (noting that the existence of a legal duty is "central to a negligence claim" and is "primarily a question of law"); see also *Markowitz v. Arizona Parks Bd.*, 706 P.2d 364, 366 (Ariz. 1985)

(en banc) ("[A] negligence action may be maintained only if there is a duty or obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm."). We have defined duty as "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Endres*, 2008 VT 124, ¶ 11 (quotation omitted). In assessing whether a duty exists, "[t]he question is whether the relationship of the parties was such that the defendant was under an obligation to use some care to avoid or prevent injury to the plaintiff." *Markowitz*, 706 P.2d at 368; see also *Langle v. Kurkul*, 146 Vt. 513, 520, 510 A.2d 1301, 1305 (1986) (in determining whether duty of care exists, courts consider relationship between parties, nature of the risk (including its foreseeability), and public policy implications of imposing a duty on defendant to protect against the risk). In their analysis of circumstances similar to those here, other courts have considered these factors:

> whether the doctor was in a unique position to prevent harm, the burden of preventing harm, whether the plaintiff relied upon the doctor's diagnosis or interpretation, the closeness of the connection between the defendant's conduct and the injury suffered, the degree of certainty that the plaintiff has or will suffer harm, the skill or special reputation of the actors, and public policy.

*Stanley v. McCarver*, 92 P.3d 849, 853 (Ariz. 2004).

¶ 8. The facts here disclose a consultation of limited duration. Decedent and her mother signed an informed consent form, and the doctor stated in writing that the scope of his services was limited. At the same time, however, there is no dispute that the doctor performed a psychiatric evaluation of decedent, following which the doctor offered recommendations for decedent's treatment. And the record reveals the parties' expectation that the doctor would aid in decedent's treatment through his expertise, regardless of the mechanism of doctor-patient contact. In requesting a consultation with the doctor, decedent's treatment team specifically sought recommendations about decedent's medication, particularly given the increase in decedent's angry and aggressive behavior and self-mutilation. They also sought the doctor's diagnostic impression and recommendations about the role that Attention-Deficit Hyperactivity Disorder might play in decedent's behavior. While decedent's medical records may not have been provided to the doctor, the doctor was provided with a very recent medical evaluation of decedent performed by another doctor, which was supplemented by additional information about decedent from decedent's treatment team. This included information that decedent had a history of depressive behavior and had recently exhibited an increase in angry, aggressive behavior, along with more frequent cutting behavior. All of this information bears on the scope of the professional relationship from which defendant's duty arose and it helps to frame the applicable standard of care. We find it sufficient to support the existence of a duty here.

¶ 9. A professional consultation may arise in many different circumstances. Defendant's involvement here was limited, but that does not mean it was nonexistent. It may be analogized to cases in which a doctor is asked to perform an independent medical examination (IME) of a patient as part of a legal investigation or an insurance claim. As in the current case, an IME doctor usually does not see a patient again or maintain an ongoing relationship with the patient; rather he or

she performs a limited analysis of the patient's condition that is provided to a third party. See *Ritchie v. Krasner*, 211 P.3d 1272, 1279-81 (Ariz. Ct. App. 2009) (considering existence of duty where insurance carrier asked defendant doctor to conduct IME); *Harris v. Kreutzer*, 624 S.E.2d 24, 29-32 (Va. 2006) (considering medical malpractice claim against doctor retained to conduct a court-ordered IME). Many courts addressing IME cases have concluded that an IME creates a doctor-patient relationship that "imposes fewer duties on the examining physician than does a traditional physician-patient relationship," but "still requires that the examiner conduct the examination in such a way as not to cause harm." *Dyer v. Trachtman*, 679 N.W.2d 311, 316 (Mich. 2004); see also *Ritchie*, 211 P.3d at 1280 ("[A]n IME doctor has a duty to conform to the legal standard of reasonable conduct in the light of the apparent risk." (quotation omitted)); *Harris*, 624 S.E.2d at 32 (holding that "a cause of action for malpractice may lie for the negligent performance of a [court-ordered medical examination]," but that the examining physician's "duty is limited solely to the exercise of due care consistent with the applicable standard of care so as not to cause harm to the patient in actual conduct of the examination").

¶ 10. Here, the relationship between doctor and patient was even more direct than a third-party-retained IME doctor. The defendant became involved on referral from decedent's treatment team and reported to them his findings and recommendations after evaluation. We hold that the ninety-minute consultation performed in this case created a doctor-patient relationship. We acknowledge that the telepsychiatry research study conducted by the doctor provided no treatment component directly to decedent, other than recommendations to her treatment team. However, through this consultation, a limited doctor-patient relationship was es-

tablished, and we conclude that a duty of due care applies. Through this consultation, defendant's doctor assumed a duty to act in a manner consistent with the applicable standard of care so as not to harm decedent through the consultation services provided.

¶ 11. Defendant argues that submission of the psychiatrist's consultation evaluation to decedent's treatment team terminated any doctor-patient relationship that ever existed, and defendant equates the ending of this relationship with the termination of any "further duty to the patient."[1] We hold, however, that even if doctor-patient contact had ended, this does not terminate the doctor's responsibility for the consequences of any lapses in his duty to provide services consistent

---

[1] Defendant contends that plaintiffs failed to properly preserve their arguments pertaining to termination of the doctor-patient relationship, claiming that "[p]laintiffs here did not . . . argue that the doctor-patient relationship — if any ever existed — between [defendant] and [decedent] was not terminated in exactly the manner [defendant] contended it was." To some extent, defendant appears to conflate the issue of whether a doctor-patient relationship existed with whether defendant had a continuing responsibility for the quality of care provided to decedent. We agree that defendant had no ongoing duty to provide care for decedent after the psychiatrist's consultation ended. This does not affect, however, whether defendant can be held liable for any alleged breach of the psychiatrist's duty to meet the required standard of care during the course of the telepsychiatry research study. While plaintiffs may not have specifically addressed defendant's argument about the termination clause in the psychiatrist's consultation evaluation, whether or not the doctor-patient relationship was terminated is not dispositive.

with the applicable standard of care for the consultation. Under 12 V.S.A. § 1908(1), a doctor must exercise "the degree of care ordinarily exercised by a reasonably skillful, careful, and prudent health care professional engaged in a similar practice under the same or similar circumstances." A doctor may be liable for malpractice if "as a proximate result of ... the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred." *Id.* § 1908(3). Under this statute, whether or not a doctor has ceased treating a patient is irrelevant to whether he or she may be held liable for injuries resulting from his or her failure to exercise the proper degree of care *while treating* the patient. It is the doctor's responsibility for the services provided that is significant here, and not simply the duration of the doctor-patient relationship itself.

¶ 12. On these facts, however, the scope of defendant's duty and the standard of care cannot yet be determined. In evaluating the standard of care, we must not conflate the existence of a duty with the appropriate standard of care, an issue that takes us beyond the limited facts in the record before us and was not properly raised below. See W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 53, at 356 (5th ed. 1984) ("It is better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other . . . ."). Prosser explains that "in negligence cases, the duty is always the same — to conform to the legal standard of reasonable conduct in light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty." *Id.*; see also *Markowitz*, 706 P.2d at 367 (emphasizing that conflating these issues "incorrectly leads to attempts to decide on a general basis whether a defendant has a 'duty' " to take certain actions, such as posting

warning signs, or providing additional traffic signs, and recognizing that "[t]hese details of conduct bear upon the issue of whether the defendant who does have a duty has breached the applicable standard of care and not whether such a standard of care exists in the first instance" (citations omitted)).

¶ 13. As the *McCarver* court observed, "[t]he standard of care imposes on those with special skills or training . . . the higher obligation to act in light of that skill, training, or knowledge." 92 P.3d at 854. Thus, in *McCarver*, the court found that the doctor in question had "assumed a duty to conform to the legal standard of care for one with his skill, training, and knowledge," but concluded that the question of "what is necessary to satisfy the standard will depend upon the facts of each case." *Id.* We do not yet know plaintiffs' position on the standard of care in this case, i.e., what a "reasonably skillful, careful, and prudent health care professional" would have done under similar circumstances, or how any alleged breach of this standard was the proximate cause of harm to decedent. 12 V.S.A. § 1908(1).

¶ 14. The issue of standard of care was not raised by defendant in its motion for summary judgment, nor decided by the trial court.[2] It is not the role of this Court

[2] It is unclear why plaintiffs advanced any argument regarding the standard of care and the alleged breach of such standard in their response to defendant's motion for summary judgment. As defendant asserted below, plaintiffs appeared to have confused the issue of duty with the remaining elements of their medical malpractice claim. Defendant expressly noted below that its motion "turn[ed] solely on the threshold question of whether [the doctor] even had a duty to [decedent], not whether a breach of that duty occurred." It also agreed that "if the basis of [its] Motion turned on an alleged breach of the standard of care, then its

652

to set that standard or to evaluate whether it was breached at this stage of the proceedings. Expert testimony is required. See *Senesac v. Assocs. in Obstetrics & Gynecology*, 141 Vt. 310, 313, 449 A.2d 900, 902 (1982) (in medical malpractice action, plaintiff must ordinarily produce "expert medical testimony setting forth: (1) the proper standard of medical skill and care; (2) that the defendant's conduct departed from that standard; and (3) that this conduct was the proximate cause of the harm complained of"); see also *Ritchie*, 211 P.3d at 1279 (noting that, aside from duty, the remaining "elements of negligence are factual issues, and are generally within the province of the jury").

¶ 15. This is a lawsuit in its formative stages. The motion for summary judgment was filed six months after the complaint was filed and raised the sole question of the duty of care of this consulting doctor. The remaining elements of plaintiffs' claim have not yet been fully developed, and defendant did not move for summary judgment on these elements. See *State v. Therrien*, 2003 VT 44, ¶ 23 n.3, 175 Vt. 342, 830 A.2d 28 (recognizing "general rule that summary judgment should not be granted on an issue not raised in the summary judgment motion unless the party against whom summary judgment is granted is given full and fair notice and opportunity to respond to the issue prior to the entry of summary judgment"). Given our conclusion that a duty exists, we reverse and remand for additional proceedings.

*Reversed and remanded.*

Note: Justice Burgess was present at oral argument, but did not participate in this decision.

Motion for Summary Judgment would be premature." As previously noted, the trial court did not address any issue other than duty in its decision.