8 P.3d 386

Vainus DIGGS, Sr., the surviving husband of Cynthia Collette Diggs, deceased, for and on behalf of himself and Vivian Tinsley, Vanessa E. Diggs, and Vansamuel Lamar Diggs the surviving children of the deceased; Samuel Hamilton And Sammietta Hamilton, surviving parents of the deceased, Plaintiffs–Appellants,

v.

ARIZONA CARDIOLOGISTS, LTD., an Arizona corporation; Arizona Cardiology Group, P.C., an Arizona corporation; Ruben S. Valdez, M.D., Defendants–Appellees.

No. 1 CA–CV 99–0508.

Court of Appeals of Arizona, Division 1, Department C.

Aug. 8, 2000.

Review Denied Feb. 13, 2001.

Snyder and Wenner, P.C. by David A. Wenner, Howard M. Snyder and Copple, Chamberlain, Boehm & Murphy, P.C. by Steven D. Copple, Scott E. Boehm, Phoenix and Law Offices of Richard Grand by Richard D. Grand, Tucson and Law Office of John D. Shaw by John D. Shaw, Phoenix, Attorneys for Plaintiffs–Appellants.

White and Cummings, P.C. by Frederick M. Cummings, Robert W. Blesch, Phoenix, Attorneys for Defendants–Appellees.

## OPINION

TOCI, Judge.

¶ 1 After conferring with cardiologist, Dr. Rubin S. Valdez, the St. Luke's Medical Center emergency room physician, Dr. Paul Johnson, treated Cynthia Diggs' severe chest pain and released her. Three hours later, she died of a heart attack. Her husband, Vainus Diggs, Sr., her children, and her parents filed a medical malpractice suit against, among others, Dr. Valdez, Arizona Cardiologists, Ltd., and Arizona Cardiology Group,

P.C. ("the Valdez defendants"). The trial court granted summary judgment to the Valdez defendants reasoning that, without an express or implied physician-patient relationship, Dr. Valdez owed no duty of care to Mrs. Diggs.

¶ 2 The issue is whether Dr. Valdez's brief discussion with Dr. Johnson, during which Dr. Valdez reviewed Mrs. Diggs' clinical records and rendered advice on the diagnosis and treatment of her medical condition, is sufficient to create a duty from Dr. Valdez to Mrs. Diggs. We hold that when Dr. Valdez undertook to give advice to Dr. Johnson regarding Mrs. Diggs' care and treatment, knowing that Dr. Johnson would rely on this advice, Dr. Valdez owed a duty of reasonable care to Mrs. Diggs. We also hold that an express physician-patient relationship is not a requisite for finding a duty of reasonable care under these circumstances. We therefore do not determine whether an express physician-patient relationship existed between Dr. Valdez and Mrs. Diggs. Because summary judgment was inappropriate, we reverse and remand.

## BACKGROUND

¶ 3 On the morning of July 17, 1996, Mrs. Diggs was stricken with severe chest pain. Paramedics took her to the St. Luke's Medical Center Emergency Department where she was seen by Dr. Johnson. Dr. Johnson took her medical history, examined her, and ordered an electrocardiogram ("EKG") and an echocardiogram. Although the EKG machine indicated that Mrs. Diggs was suffering from myocardial infarction, Dr. Johnson thought that her physical symptoms were indicative of pericarditis, inflammation of the sac around the heart.

¶ 4 Dr. Johnson had treated pericarditis in the past but before he could be certain that Mrs. Diggs was suffering from pericarditis he had to rule out myocardial infarction as a possible diagnosis. He was, however, untrained in the interpretation of echocardiograms and thus was unable to use the results of this test to make a differential diagnosis. Furthermore, because the computer interpretation generated by the EKG machine

conflicted with Dr. Johnson's interpretation of the EKG, he needed confirmation from a cardiologist that the EKG demonstrated pericarditis, rather than myocardial infarction.

¶ 5 Dr. Johnson saw Dr. Valdez visiting another patient in the Emergency Department. Although Dr. Valdez was not the on-call cardiologist at that time, Dr. Johnson and Dr. Valdez briefly discussed Mrs. Diggs' case. Dr. Johnson presented Dr. Valdez with Mrs. Diggs' clinical history and the results of his physical examination. Dr. Valdez also reviewed the EKG results.

¶ 6 Dr. Valdez agreed with Dr. Johnson that Mrs. Diggs should be discharged. They concluded that Mrs. Diggs' pericarditis should be treated with Indocin, a nonsteroidal anti-inflammatory medication, and that she follow up with her family practice physician immediately. Dr. Valdez also offered to see Mrs. Diggs in ten days for follow-up care.

¶ 7 Dr. Johnson discharged Mrs. Diggs around 1 p.m. with the above instructions. She died about three hours later of cardiopulmonary arrest. After her death, another cardiologist at St. Luke's reviewed Mrs. Diggs' EKG and echocardiogram pursuant to the hospital's practice to have a cardiologist review all such tests for an "official" interpretation. The tests confirmed that Mrs. Diggs was suffering from an acute myocardial infarction while she was in the emergency department earlier in the day.

¶ 8 Plaintiffs filed this medical malpractice action against Dr. Johnson, the three corporate entities doing business as St. Luke's, and the Valdez defendants, requesting damages for wrongful death. The Valdez defendants moved for summary judgment, arguing that Dr. Valdez only informally consulted with Dr. Johnson regarding Mrs. Diggs and owed her no duty of care. Plaintiffs filed a cross-motion for summary judgment on the issue, arguing that Dr. Valdez owed a duty of care to Mrs. Diggs because he: (a) formed a physician-patient relationship with Mrs. Diggs; (b) negligently performed voluntary undertakings according to Restatement (Second) of Torts (1965) ("Restatement") sections 323, 324, and 324A; and (c) was contractually obligated to treat Mrs. Diggs under St. Luke's Bylaws.

¶ 9 The trial court found no contractual physician-patient relationship between Dr. Valdez and Mrs. Diggs and relying on *Hafner v. Beck*, 185 Ariz. 389, 916 P.2d 1105 (1995), decided as a matter of law that Dr. Valdez did not owe a duty to Mrs. Diggs. The court concluded that Dr. Valdez's involvement was limited to an informal consultation that did not give rise to a duty of due care. It further rejected plaintiffs' argument based on the Bylaws because they presumed a physician-patient relationship that did not exist. The court did not address plaintiffs' Restatement arguments.

¶ 10 After the court granted summary judgment for the Valdez defendants, plaintiffs settled their claims against the remaining defendants. The court entered an order dismissing the claims against Dr. Johnson and the St. Luke's entities and entered judgment in favor of the Valdez defendants. Plaintiffs timely filed this appeal of the summary judgment in favor of the Valdez defendants.

## DISCUSSION

¶ 11 Ordinarily, the existence of a duty is a question of law. *See Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985). In some circumstances, however, the existence of a duty may depend on preliminary questions that must be determined by a fact finder. *See, e.g., Siddons v. Business Properties Dev. Co.*, 191 Ariz. 158, 159, ¶ 4, 953 P.2d 902, 903 (1998) (whether landlord had a duty to keep premises safe depended on factual question of whether premises were within landlord's control). When such preliminary facts are in dispute, summary judgment on the issue of duty is inappropriate. *See id.* at ¶ 7, 953 P.2d 902. Here, however, the record contains sufficient undisputed facts for us to determine that Dr. Valdez's involvement in Mrs. Diggs' treatment gave rise to a duty of reasonable care.

¶ 12 We observe that courts have reached differing conclusions when considering whether a consulting physician owes a duty of care to the patient. The cases range from a doctor simply answering a colleague's casual telephone inquiry about a course of treat-

ment to an on-call doctor examining and essentially directing the course of the patient's treatment. *See Oja v. Kin,* 229 Mich. App. 184, 581 N.W.2d 739, 741–43 (1998) (discussing spectrum of situations); *see also* James L. Rigelhaupt, Jr., Annotation, *What Constitutes Physician–Patient Relationship for Malpractice Purposes,* 17 A.L.R.4th 132 (1982). Generally, where a physician has been informally consulted, the courts deny recovery for negligence, theorizing that a duty cannot exist absent a contractual relationship. *See* Rigelhaupt, 17 A.L.R.4th at 135–36; *Oja,* 581 N.W.2d at 743.

¶ 13 But the employment contract rationale is unsatisfactory when, for example, diagnostic medical services are provided by a pathologist. No express physician-patient relationship exists yet many courts have concluded that the physician who provides consulting services to a treating doctor for the benefit of an unknown patient has an "implied" contract of employment that gives rise to a duty. *See, e.g., Dougherty v. Gifford,* 826 S.W.2d 668, 674–75 (Tex.App.1992)(implying relationship between patient and pathologists because diagnostic services were furnished on patient's behalf); *Walters v. Rinker,* 520 N.E.2d 468, 471–72 (Ind.App.1988)(implying relationship between patient and pathologist because patient's treating physician requested pathologist's services on behalf of patient).

■ ¶ 14 In the instant case, we decline to apply this rationale. Although an express contractual physician-patient relationship clearly gives rise to a duty to the patient, the absence of such a relationship does not necessarily exclude a duty to the patient. Nor, in our view, is it necessary for the court to "imply" a contractual relationship between physician and patient in order to find a duty of reasonable care. Rather, we follow our supreme court's traditional approach to duty and determine whether a sufficient relationship existed between Dr. Valdez and Mrs. Diggs such that, as a matter of policy, Dr. Valdez owed her a duty of reasonable care. *See Markowitz,* 146 Ariz. at 356, 706 P.2d at 368.

¶ 15 Because the trial court relied on *Hafner* for the proposition that a contractual

physician-patient relationship must exist to establish a duty in a medical malpractice action, we first examine that case. There, a workers' compensation claimant sued a psychologist who performed an independent medical examination for the insurance carrier. 185 Ariz. at 390, 916 P.2d at 1106. The claimant alleged that the psychologist's examination fell below the standard of care and that he " 'negligently reported incorrect information' about her to the [carrier]." *Id.* The court reasoned that because the psychologist was hired by the carrier to evaluate the claimant and not to treat her, his duty of care ran only to the carrier. *Id.* at 392, 916 P.2d at 1108.

¶ 16 We conclude that the trial court read *Hafner* too broadly when it relied on the statement that "[a] medical malpractice suit *such as this* will lie only when there was a doctor patient relationship creating a duty to act for the patient's benefit." *Id.* at 391, 916 P.2d at 1107 (citing *Ornelas v. Fry,* 151 Ariz. 324, 329, 727 P.2d 819, 824 (1986)) (emphasis added). The defendant in *Hafner* was an independent psychologist who had no therapeutic relationship with the patient. The court emphasized the narrow basis for its holding by stating that a doctor who conducts an independent medical examination and does not " 'intend to treat, care for or otherwise benefit the employee' " has no duty to that person. *Id.* at 392, 916 P.2d at 1108 (quoting *Johnston v. Sibley,* 558 S.W.2d 135, 137–38 (Tex.Civ.App.1977)).

■ ¶ 17 Duty is, after all, merely "an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Ontiveros v. Borak,* 136 Ariz. 500, 508, 667 P.2d 200, 208 (1983). Quoting *Coburn v. City of Tucson,* 143 Ariz. 50, 52, 691 P.2d 1078, 1080 (1984), *Hafner* correctly notes that the question is whether there is a " 'relation between individuals which imposes upon one a legal obligation for the benefit of the other.' " 185 Ariz. at 392, 916 P.2d at 1108. As we read *Hafner,* it states that because the defendant rendered no treatment, the relationship between the parties was so attenuated that, for policy reasons, the plaintiff was not entitled to protection.

¶ 18 We find support for our analysis of *Hafner* in *Ornelas,* a case on which the *Hafner* court relied to support its holding. 151 Ariz. at 329, 727 P.2d at 824. There, an organ donor sued the donee's anesthesiologist for the unnecessary loss of a donated kidney. The *Ornelas* court found that the anesthesiologist did not owe the donor a duty because the donor "failed to allege or prove the existence of a physician/patient relationship [between the donor and the anesthesiologist] *or any other legal theory which would give rise to any legal duty* on the part of [the anesthesiologist]." *Id.* (emphasis added).

¶ 19 In examining whether any legal theory exists here that would, in the words of *Ornelas,* "give rise to any legal duty," we are guided by *Ontiveros.* There, our supreme court extended the duty a tavern keeper owes to his patrons to include the "obligation to help control the conduct of his patron in order to prevent that patron from injuring someone else." 136 Ariz. at 508, 667 P.2d at 208. The court based this extension on the policy of placing duties on those most capable of preventing the harm caused by the intervening negligence of others. *Id.* This policy is guided by one of the underlying principles of our system of tort law: the prevention of future harm. *See* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 4 at 25 (5th ed. 1984) ("The 'prophylactic' factor of preventing future harm has been quite important in the field of torts").

¶ 20 Returning to the facts in this case, we note that Dr. Valdez was in a unique position to prevent future harm to Mrs. Diggs. Dr. Johnson approached Dr. Valdez, the head of St. Luke's cardiology department, for assistance in making certain determinations about Cynthia Diggs' medical care that Dr. Johnson was not fully qualified to make on his own. As between Dr. Johnson and Dr. Valdez, only Dr. Valdez had the expertise to interpret the echocardiogram, rule out myocardial infarction on the basis of the EKG, and admit Cynthia Diggs to the hospital for further treatment. Dr. Valdez, with his superior knowledge and experience,

was in the best position to correct any error in Dr. Johnson's diagnosis.

¶ 21 Furthermore, the Restatement section 324A, which we previously adopted in *Tollenaar v. Chino Valley School District,* 190 Ariz. 179, 181, 945 P.2d 1310, 1312 (1997), provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or ... (c) the harm is suffered because of reliance of the other or third person upon the undertaking.[1]

Thus, if an actor's negligent undertaking "results in increasing the risk of harm to a third person, the fact that he is acting under a ... gratuitous agreement with another will not prevent his liability to the third person." *Id.* at cmt. c. Additionally, "[w]here the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such risk, the harm results from the negligence as fully as if the actor had created the risk." *Id.* at cmt. e.

¶ 22 Taking the undisputed facts and all inferences therefrom in a light most favorable to Mrs. Diggs, see *Valencia Energy Co. v. Arizona Department of Revenue,* 191 Ariz. 565, 568, ¶ 2, 959 P.2d 1256, 1259 (1998), we find that Dr. Valdez voluntarily undertook to provide his expertise to Dr. Johnson, knowing that it was necessary for the protection of Mrs. Diggs and that Dr. Johnson would rely on it. Dr. Valdez knew that the computer interpretation generated by the EKG indicated an acute myocardial infarction and that proper interpretation of the EKG required a cardiologist. In his deposition, Dr. Valdez agreed that he confirmed Dr. Johnson's pericarditis diagnosis, that he recommended Mrs. Diggs be treated with Indocin, and that by ordering Mrs. Diggs to follow-up with him in

---

1. When section 324A makes a person "subject to liability" for the described conduct, the existence of a duty is assumed.

ten days, he implied to Dr. Johnson that it was safe to discharge her.

¶ 23 Dr. Valdez admitted that his advice significantly affected Mrs. Diggs' treatment. When asked what Dr. Johnson did to rule out myocardial infarction as a diagnosis, Dr. Valdez answered: "He relied on the clinical history. He relied on my curbside consult, and he thought that the clinical history and all the findings most favored pericarditis." Dr. Valdez later conceded, however, that nothing about the EKG, the clinical history, or the physical examination ruled out myocardial infarction. We can reasonably infer from this testimony that the principal factor that led Dr. Johnson to rule out myocardial infarction was his reliance on Dr. Valdez's "curbside" opinion that Mrs. Diggs suffered from pericarditis.

¶ 24 Dr. Valdez further testified that if he had considered Mrs. Diggs as his own patient, he would have ordered a cardiac enzyme test to rule out myocardial infarction. Mrs. Diggs was discharged, however, without the benefit of that additional test. Dr. Valdez's advice and implicit opinion that it was safe to discharge Mrs. Diggs consequently increased the risk of harm to her.

¶ 25 Dr. Valdez argues that if we find that he had a duty to Mrs. Diggs under these circumstances, "informal" exchange of information between medical professionals will be chilled. We are not persuaded. We are not dealing with the informal exchange of medical information between two physicians, one of whom merely serves as a resource such as a treatise or textbook. In that case, where the treating physician exercises independent judgment in determining whether to accept or reject such advice, few policy considerations favor imposing a duty on the advising physician. *See Gilinsky v. Indelicato*, 894 F.Supp. 86 (E.D.N.Y.1995).

¶ 26 Here, Dr. Johnson was not free to accept or reject Dr. Valdez's advice. Dr. Johnson was not a cardiologist; he needed the specialized knowledge of someone such as Dr. Valdez to read the echocardiogram and to confirm his interpretation of Mrs. Diggs' EKG. Furthermore, because Dr. Johnson did not have admitting privileges, only Dr. Val-

dez could admit Cynthia Diggs to St. Luke's Medical Center.

¶ 27 The record and all reasonable inferences indicate that Dr. Johnson did not exercise independent judgment as to Cynthia Diggs' diagnosis; rather he subordinated his professional judgment to that of the specialist in cardiology, Dr. Valdez. Paraphrasing the Restatement, section 324A, comment e, Dr. Johnson's reliance on Dr. Valdez induced him to forgo other remedies or precautions against such risk. We conclude from this record that when Dr. Valdez rendered his opinions, he effectively became a provider of medical treatment to Mrs. Diggs. This relationship between Dr. Valdez and Mrs. Diggs gave rise to a duty of reasonable care from Dr. Valdez to Mrs. Diggs.

### CONCLUSION

¶ 28 We conclude that even without a contractual relationship, Dr. Valdez owed Mrs. Diggs a duty of due care in rendering medical advice regarding her diagnosis and treatment. We reverse the grant of summary judgment to the Valdez defendants and remand this case for further proceedings consistent with this decision.

CONCURRING: JEFFERSON L. LANKFORD, Presiding Judge, and E.G. NOYES, JR., Judge.