Amparo **VILLANUEVA,**
**et al., Plaintiffs,**

v.

**UNITED STATES of America,**
**Defendant.**

**Nos. CV–01–663–TUC–DCB,**
**CV–02–323–TUC–DCB.**

United States District Court,
D. Arizona.

Oct. 29, 2009.

Matthew P. Millea, Treon Aguirre & Newman PA, Phoenix, AZ, Thomas G. Cotter, Haralson Miller Pitt Feldman & McAnally PLC, Tucson, AZ, for Plaintiffs.

Andrew D. Kaplan, Robin Doyle Smith, Jeffrey Paul Ehrlich, Philip Davis MacWilliams, U.S. Dept. of Justice, Washington, DC, Janet Martin, U.S. Attorney's Office, Tucson, AZ, for Defendant.

## ORDER

DAVID C. BURY, District Judge.

A civil plenary bench trial on the three factual issues remanded by the Ninth Circuit was conducted before this Court from August 10, 2009 through August 13, 2009 with Thomas G. Cotter, Esq., appearing for Plaintiffs, and Philip D. MacWilliams, Esq., appearing for Defendant.[1] After completion of the trial, both parties submitted proposed findings of fact and conclusions of law, as well as supporting legal memoranda. Closing argument was heard by the Court on September 20, 2009. The Court now rules, as follows:

## RULING

The Court finds in favor of the Defendant. Based on the Court's findings of fact and conclusions of law (below), this Court lacks federal subject matter jurisdiction in this Federal Tort Claim Act (FTCA) action against the Mine Safety and Health Administration (MSHA) for the accident that occurred in January 2000 at the Asarco Mission Mine. After a four day evidentiary hearing, including the opportunity to observe and listen to witnesses, as well as thoroughly review admitted exhibits this Court finds that MSHA

---

1. Pursuant to the Memorandum Decision of the Ninth Circuit Court of Appeals dated December 29, 2008 (No. 07–17115).

Supervisor Kirk exercised his discretion to evaluate each of the anonymous complaints that he received and MSHA Inspector Varland fulfilled his duty under the Act to inspect the mine. In addition, the Court finds that the miners did not rely on Kirk's evaluation and/or Varland's inspection as services rendered, such that comparable private person liability under Arizona law and the Restatement of Torts (Second) § 324A(c) was triggered.

## STIPULATIONS OF FACT

The Court adopts and relies on, as part of its findings of fact, the following stipulations of fact contained in the party's joint proposed prehearing order [2]:

1. ASARCO Mission Mine (the mine) is a multi-level underground copper mine located near the town of Sahuarita, Pima County, Arizona.

2. At all times relevant to this action, the mine was operated by ASARCO, Inc. (ASARCO).

3. Surface operations at the mine began in 1956. Underground operations at the mine began in October of 1994.

4. Copper bearing ore is drilled and blasted from stopes at various levels in the mine. The rock broken from the blasting is transported to the surface on trucks, where it is loaded on to surface haulage trucks and transported to the mine's mill for crushing, grinding, and processing.

5. One method of mining used at the mine involved drilling holes into the ceiling of the stope and then using explosives to blast loose part of the ceiling.

6. Defendant United States of America, through its agency, the United States Department of Labor, operates the Mine Safety and Health Administration (MSHA).

7. Pursuant to the Mine Safety Act of 1977, MSHA conducts inspections of underground mines at least four times per year. These inspections are often referred to as "regularly scheduled inspections," "regular inspections," "quarterly inspections," or "01 inspections."

8. In November 1999, at the time of MSHA's last regular inspection of the mine for calendar year 1999, approximately 81 full time employees were employed at the mine, which was operating around the clock five days per week for three, eight-hour shifts.

9. On the evening of January 31, 2000, three miners—Jose Villanueva, Joe Olson, and Javier Vargas—were assigned the task of loading explosives into approximately 85 blast holes in the ceiling (also referred to as "roof," "ground," or "back") of Stope 215 North at the intersection of the L and 9 drifts. The three miners' shift began at 4 p.m.

10. At approximately 8:00 p.m., a slab of rock—which weighed approximately nine tons and measured approximately 11.5 feet long, 9.5 feet wide, and 1.5 feet thick—fell from the ceiling of Stope 215 North where the three miners were loading explosives.

11. Prior to the accident, a series of blasting occurred in an area east of the K access drift of Stope 215 North, which included the 9, 10, and L drifts. The ceiling in Stope 215 North from which the rock fall occurred also was subject to drilling by the mining crew that worked the shift immediately prior to Messrs. Villanueva, Vargas, and Olson.

12. The falling rock struck the boom of the manlift in which Messrs. Villanueva

---

**2.** (Joint Proposed Prehearing Order at 2–7, Doc. No. 217.) The Court did not adopt all of the stipulations of fact.

and Olson were standing, causing them to fall approximately 25 feet to the floor of the stope. Mr. Olson was injured from the fall, and Mr. Villanueva died as a result of the fall. Mr. Vargas, who was on the floor of the stope at the time of the rock fall, also was injured.

13. MSHA did not conduct an inspection of the mine between November 23, 1999 and January 31, 2000.

14. MSHA was notified of the accident at approximately 9:30 p.m. on the date of the accident.

15. An accident investigation team, which included MSHA Investigators Larry O. Weberg (now deceased) and Robert V. Montoya, arrived at the mine on February 1, 2000.

16. An anonymous written complaint dated January 25, 1999, regarding perceived safety hazards at the mine, was received by the MSHA field office in Mesa, Arizona.

17. Between March and September 22, 1999, Maria Villanueva, daughter of Jose A. Villanueva, and her friend, David Lazano, placed a series of anonymous telephone calls to the MSHA field office in Mesa, Arizona, regarding perceived safety hazards at the mine. These anonymous phone calls were received by James Kirk, who at the time of these calls was the MSHA Mesa Field Office Supervisor.

18. At no time during the aforementioned anonymous phone calls did the callers provide James Kirk with their names or the identify of the miner on whose behalf they were making such complaints.

19. On September 28, 1999, during a regular inspection of the mine, MSHA Inspector Varland issued Citation/Order Number 7934808 to ASARCO for "loose rock" at Stope 225 of the mine.

20. The excerpt from Volume III, Part 43, Section 43–1 of the MSHA Program Policy Manual is from the MSHA Program Policy Manual in effect at the time of the regular inspections conducted by MSHA in calendar year 1999, and at the time of the receipt by James Kirk of the aforementioned anonymous complaints regarding perceived safety hazards at the mine.

21. The excerpt from MSHA Handbook Series: General Inspection Procedures (Handbook Number PH89–IV–2) is from the MSHA Handbook Series: General Inspection Procedures (Handbook Number PH89–IV–2) in effect at the time of the regular inspections conducted by MSHA in calendar year 1999, and at the time of the receipt by James Kirk of the aforementioned anonymous complaints regarding safety conditions at the mine.

22. MSHA conducted four regular inspections of the mine in calendar year 1999, which took place on: March 8–11, 1999; April 27, 1999 to May 4, 1999; September 27–30, 1999; and November 17–23, 1999. The inspection party for the first three regular inspections of the mine in calendar year 1999 included MSHA Inspector Alan L. Varland.

23. The inspection party for the fourth regular inspection of the mine in calendar year 1999, which occurred on November 17–23, 1999, included MSHA Inspector David D. Estrada.

24. The agency's response to the aforementioned anonymous complaints was the focus of investigations in the months after the January 31, 2000 accident.

25. MSHA conducted an internal investigation of the way its personnel handled the anonymous complaints.

26. Following MSHA's internal investigation, the Office of Inspector General (OIG) of the United States Department of Labor also conducted an internal investigation of the way its personnel handled the aforementioned anonymous complaints.

27. On April 19, 2000, James Kirk received an official reprimand from Jake H. DeHerrera, then-Acting District Manager of MSHA's Rocky Mountain District.

28. Following the reprimand, James Kirk was removed from his position as Mesa Field Office Supervisor, and was transferred to an MSHA field office in Lakewood, Colorado.

29. On August 24, 2000, then-Assistant District Manager of MSHA's Rocky Mountain District sent Inspector Alan Varland a Notice of Proposed Removal.

30. On September 22, 2000, then District Manager Irvin T. Hooker of MSHA's Rocky Mountain District sent MSHA Inspector Alan Varland a Decision on Proposed Removal.

## COURT'S ADDITIONAL FINDINGS OF FACT

31. The content of the anonymous telephone calls placed to Supervisor Kirk from Mrs. Villanueva are most accurately reflected in the statements made closer in time to the accident, such as in her deposition and her statement to OIG Inspector Ratliff.

32. Supervisor Kirk was not informed of any problems with backstoping in the anonymous complaints made by Mrs. Villanueva or the family friend.

33. The testimony of Supervisor Kirk is credible in that he was never made aware of the actual mining situation that eventually was the cause of the mining accident in January 2000.

34. The contents of the January 1999 letter, as well as the anonymous telephone complaints were thoroughly addressed and resolved by the end of the September MSHA inspection.

35. Kirk did not have a recollection of reading the January 1999 letter until he discovered it as part of the March 1999 inspection. (Def. Trial Ex. 116.)

36. Inspector Estrada was not made aware of the contents of the anonymous telephone complaints or the January 1999 letter because these complaints were considered resolved by the September 1999 inspection.

37. No complaints were received by Kirk or Varland after the September 1999 inspection.

38. The MSHA policy at the time of these inspections through the time of the accident was that Kirk and Varland could use their discretion and decisionmaking abilities to evaluate anonymous complaints and implement inspections with reference to anonymous complaints.

39. The complaints relayed to Kirk during this first anonymous call were very general in nature, and consisted of: poor ventilation, hot areas in the mine, electrical cords being run over, and bad ground conditions. Ms. Villanueva did not mention to Kirk that areas of the mine were being taped off prior to inspections to prevent inspectors from entering those areas and seeing unsafe conditions. (8/11/09 Bench Trial Transcript (TR) at 6–7).

40. Kirk evaluated whether this anonymous call qualified as a 103(g)(1) complaint, 2 which would require a complaint inspection (separate and apart from the regular 01 inspections) as quickly as possible. Because the complaint was not a written complaint signed by a miner, Kirk determined it was an informal complaint rather than a 103(g)(1) complaint. (8/11/09 Tr. at 8, 11; 8/12/09 Tr. at 7–8).

41. Even though the anonymous call did not meet the criteria for a 103(g)(1) complaint, Kirk understood that the Program Policy Manual ("the Manual") obligated him to evaluate the complaint to determine a course of action. (8/11/09 Tr. at 9–10).

Specifically, the Manual in effect at the time of the anonymous calls in 1999 provided that when an inspector receives information about hazards in a mine in an informal manner, the inspector:

must evaluate and determine a course of action, which in some cases may result in an immediate inspection, but in other cases may not. . . .

Depending upon the circumstances, the inspector may incorporate the area or practices into his or her inspection schedule for attention at a later date.

Likewise, the inspector may determine that the area in question has been inspected since the alleged occurrence and, consequently, the situation does not warrant further investigation.

(Def. Trial Ex. 114.)

42. While the Manual and the Handbook required that the inspector evaluate informal complaints and determine a course of action for responding to them, these documents provided no guidance or criteria to follow when determining an appropriate response. Furthermore, there was no requirement in 1999 that the recipient of an informal complaint prepare a report to document whether or how a complaint was evaluated. (8/11/09 Tr. at 10–11, 31, 98–99; 8/12/09 Tr. at 7–9, 63–64).

43. There was no other policy that applied nationally or within the Rocky Mountain District that in any way conflicted with or took away the discretion Kirk was permitted to exercise when evaluating and responding to informal complaints. (8/11/09 Tr. at 68, 92–93, 117–118; 8/12/09 Tr. at 48). To the extent there were any policies that took away this discretion from MSHA personnel who receive informal complaints, such policies would have come into effect only after the January 31, 2000 accident. (8/12/09 Tr. at 48; 71–74).

44. In evaluating the informal complaint and deciding what course of action to take, Kirk took into account the generalized nature of the complaints (i.e., the fact that they were general concerns that exist in every mine, rather than specific, time sensitive dangers); the fact that these are the types of conditions that are routinely looked for at regular inspections; the lack of specificity as to where these conditions were located within the mine; and his office's resources. Regarding resources, Kirk determined that an investigation into such generalized complaints would, as a practical matter, cause his inspector to conduct an inspection of the entire mine, which would not count toward the four annual inspections required by statute. Kirk explained that his office consisted of about twelve inspectors who were responsible for inspecting between 450 and 500 mines throughout Arizona. In light of these limited resources, Kirk believed that his office's resources could not support such a course of action. (8/11/09 Tr. at 5–6; 12–18; 26–27, 29).

45. Kirk recalled a second anonymous call from Ms. Villanueva taking place sometime in April 1999, whereas Ms. Villanueva testified that the call took place in June or July of 1999. (8/11/09 Tr. at 8; 8/10/09 Tr. at 59, 75). Kirk could tell that the caller was the same person who placed the first anonymous call. The complaints were the same four general concerns that were raised during the first call. Ms. Villanueva did not mention to Kirk that areas of the mine were being taped off prior to inspections to prevent inspectors from entering those areas and seeing unsafe conditions. (8/11/09 Tr. at 18–19).

46. Kirk evaluated whether this complaint was a 103(g)(1) complaint that would require an immediate complaint inspection. After determining that it was not a 103(g)(1) complaint, Kirk performed the

same evaluation that was performed for the first anonymous call and determined that the complaints could be looked into during the next regular inspection. (8/11/09 Tr. at 18–21; 26–27; 29).

47. Kirk recalled two more anonymous calls taking place sometime in September 1999, prior to the regular inspection scheduled for later that month. The third call was from the same female caller as the previous two calls, while the fourth call was from a male. Both calls alleged the same four general concerns raised during the previous two calls. During neither call was it alleged that areas of the mine were being taped off prior to inspections to prevent inspectors from entering certain areas of the mine and seeing unsafe conditions. (8/11/09 Tr. at 22–27).

48. For both the third and fourth calls, Kirk evaluated whether an immediate complaint inspection was warranted. Applying the same criteria he used when evaluating the first two anonymous calls, Kirk determined that the appropriate course of action would be to look into these complaints at the next regularly scheduled inspection. In addition, Kirk requested that Varland meet with every miner possible during the inspection to find out if these conditions did in fact exist at the mine. (8/11/09 Tr. at 22–27, 106–107).

49. In sum, there were a total of four anonymous calls received by Kirk in 1999 regarding perceived hazardous conditions at the mine, the last of which was received by Kirk in September 1999 prior to the regular inspection that occurred on September 27–30. (8/11/09 Tr. at 22–27, 77, 109). Kirk clearly understood what was required of him as the recipient of these anonymous calls. Kirk took them very seriously, and evaluated the complaints to determine a course of action, which was to relay these complaints to the inspector with the instruction that they be looked into at the next regular inspections. (8/11/09 Tr. at 99, 101, 102, 105–106; 8/12/09 Tr. at 31–32; Def. Ex. 122 at pg. 15 ln. 15 to pg. 16 ln. 4, pg. 63 ln. 3 to pg. 79 ln. 8, and pg. 151 ln. 8 to pg. 153 ln. 24).

50. For each regular inspection, the mine inspector is required to complete an MSHA Form 4000–40 Inspection/Investigation Data Summary ("inspection report"), which is then reviewed by his or her supervisor. Inserted into Varland's inspection report for his March 1999 inspection was an anonymous letter dated January 25, 1999 addressed to "James Kurt" (which presumably meant James Kirk) and David Hamm, the Chief Deputy Mine Inspector for the State of Arizona. The anonymous letter set forth five complaints, two of which are relevant here. The first complaint stated: "In the past, Management have prepared, closed, chained, or burmed [sic] certain stopes prior to inspectors arrival only for workers to again be sent back to those areas a few days later to work under poor conditions." The fourth complaint stated: "Not consistent with ground support . . . many areas which should be supported are neglected. Still miners are sent into these areas to do other tasks but ground support." (Def. Trial Ex. 116.)

51. Kirk did not receive the anonymous letter prior to his review of Varland's March 1999 inspection report and did not know how it came into Varland's possession. (8/11/09 Tr. at 46, 71–72).

52. It is quite common for active areas of a mine to be barricaded or "dangered off" due to unsafe conditions. Examples of unsafe conditions that require an active area to be barricaded are misfires (i.e., a shot from a previous blasting round that failed to go off) and loose ground. The type of barricade to be used is left to the discretion of the mine operator, and often includes caution tape, cones, or chains.

The mine operator is required by regulation to barricade such areas until the unsafe condition can be remedied. If an active area of a mine that contains an unsafe condition is not barricaded, the mine operator may receive a citation from MSHA. (8/12/09 Tr. at 13).

53. On many occasions, Asarco used caution tape to barricade active areas of the mine that contained safety hazards. This was done with the full knowledge that a mine inspector still had the authority to go into such areas. (8/13/09 Tr. at 9–11).

54. Although there is no evidence to support such an allegation (8/10/09 Tr. at 40–41, 121–124), some miners believed that, at the direction of mine management, miners were asked to "tape off"—i.e., string yellow caution tape across—active areas of the mine in an effort to keep inspectors from going into those areas and seeing unsafe conditions. The first complaint in the anonymous letter seems to have made this allegation.

55. Varland's March 1999 inspection report demonstrates that he investigated each of the complaints in the anonymous letter. (8/11/09 Tr. at 78). Regarding the allegation that active areas of the mine were improperly taped off, Varland discussed with mine management at the closeout conference the practice of "taping" areas off and recommended using signs to identify the reason why the area was taped off. (Def. Ex. 116). Additionally, in his field notes, Varland noted the reasons why several areas were taped off, thus indicating that he inquired into whether there was a legitimate safety reason for that area being taped off. (Def. Trial Ex. 116.)

56. Indeed, in his August 2000 deposition, Varland specifically testified that he looked into the allegation that Asarco was taping off areas of the mine prior to inspections to prevent inspectors from going into those areas and seeing unsafe conditions, but determined that there was no merit to those allegations. (Def. Trial Ex. 143 pg. 31 ln. 18 to pg. 35 line 5).

57. George Zugel, the mine's safety engineer who accompanied Varland during his 1999 inspections, took contemporaneous notes and noted that Varland looked into the allegations raised in the anonymous letter, but concluded that they had no merit. (Def. Trial Ex. 127).

58. Peter Graham, the general mine supervisor, met with Varland at the conclusion of the March 1999 inspection. At that meeting Varland informed Graham of this allegation and inquired into why certain areas of the mine were being taped off, at which time Graham offered an explanation. (8/13/09 Tr. at 51–52).

59. Gary Torres, the mine's underground supervisor who accompanied Varland during his 1999 inspections, testified that on many occasions Varland would look behind or even go behind the taped-off areas to investigate further. (8/13/09 Tr. at 11–12).

60. After his March 1999 inspection Varland did not receive any more allegations that Asarco was improperly taping off active areas of the mine.

61. Regarding the complaint in the anonymous letter about ground control, Varland noted in his March 1999 inspection report that he had discussions with mine management about ground control practices at the mine, including the mine's scaling procedures. (Def. Trial Ex. 116.) Moreover, Varland's field notes are replete with entries that describe his discussions with miners about ground control procedures, ground testing procedures, and any concerns they had regarding ground control at the mine, as well as Varland's own observations regarding ground conditions and the adequacy of the mine's ground

control. (Def. Ex. 116; 8/11/09 Tr. at 58–59).

62. Based on the testimony of Supervisor Kirk, as well as a thorough review of the inspection reports from March 1999 through September 1999, Varland properly inspected the ground conditions at the mine and evaluated the mine's ground control practices during each of his 1999 inspections. Varland spoke with numerous miners to find out whether they had any concerns over the ground conditions at the mine. With the exception of the conversation Varland had with Villanueva during the September 1999 inspection, no miners ever raised any ground control concerns with Varland. On numerous occasions, Varland also asked miners to demonstrate how they tested for loose ground and scaled loose ground to ensure it was being done properly. (8/13/09 Tr. at 8–9; Def. Trial Exs. 117, 118, 119, and 120; Def. Trial Ex. 122 at pg. 26 ln. 24 to pg. 27 ln. 19, pg. 54 ln. 4 to pg. 55 ln. 7, pg. 57 ln. 3 to pg. 59 ln. 22, and pg. 164 ln. 2 to ln. 22; Def. Trial Ex. 143 at pg. 190 ln. 4 to pg. 194 ln. 2).

63. Olson never made any complaints to MSHA, and there is no evidence that he had any knowledge of the anonymous phone calls to Kirk or the anonymous letter. (8/10/09 Tr. at 113–114).

64. Olson understood that it was the responsibility of the miners to conduct workplace inspections and take other safety precautions, regardless of whether MSHA had conducted inspections of the mine and regardless of whether that particular area had already been inspected by a prior shift. (8/10/09 Tr. at 115, 119–120).

65. It is the miner's responsibility to inspect his work area before every shift, even if that area was inspected during the prior shift, and even if MSHA had conducted inspections of the mine. Checking one's work area is particularly important in an underground mine such as the Asarco Mission Mine since ground conditions are constantly changing and can differ from one area of the mine to the next. (8/10/09 Tr. at 27, 34, 39–40, 115, 119–120; 8/12/09 Tr. at 21; Def. Trial Ex. 109 at pg. 86 ln. 19 to pg. 88 ln. 13; Def. Trial Ex. 126).

66. The miners did not forego their workplace inspections or any other safety precautions prior to commencing or during their shift on January 31, 2000. (Def. Trial Ex. 112 at para. 11; Def. Trial Ex. 111 at pg. 38 ln. 16 to pg. 40 ln. 20)

67. A review of the mine safety inspection reports from March 1999, April 1999, September 1999 and November 1999 reveals that Varland, as well as Estrada, properly inspected the Mission Mine. (Defendant Trial Exs. 116, 117, 118, and 120.)

68. Varland and Kirk thoroughly investigated the complaints based on the procedures in place at that time. Both exercised their discretion to make decisions on how to accomplish that.

69. The disciplinary action against Varland had no relationship to his inspection of the Mission Mine.

70. The disciplinary action against Kirk was derived from an internal personnel decision that involved a disagreement over his decision not whether or not he could make the decision.

71. Testimony from other, non-party miners as to what *they* viewed MSHA's purpose to be or whether *they* in anyway relied on MSHA to make their workplaces safe is not relevant to this inquiry.

72. There is no evidence of criminal wrongdoing or conflict of interest between Asarco and MSHA. The miners' union representative accompanied MSHA inspectors on all inspections during the relevant time period, but for the March 1999 inspection.

73. Robert Friend, former Deputy Assistant Secretary, testified that MSHA's interpretation of the phrase "in its entirety" is that, with respect to underground metal and nonmetal mines (i.e., non-coal mines), MSHA must inspect only the active working areas of the mine, as well as the areas where miners travel, such as walkways, passageways, and haulageways. Friend testified that, according to the agency's interpretation, if areas of the mine are abandoned or idle, there is no obligation on the part of the inspector to go into such areas. (8/12/09 Tr. at 11–13).

74. Kirk also testified that only the active areas of the mine where miners work or travel need to be inspected, and that idle areas need not be inspected. By active working areas, Kirk explained that the agency is referring to areas of the mine from which ore is actively being extracted. (8/11/09 Tr. at 34–36).

75. To determine which areas of an underground copper mine must be inspected during a regular inspection, MSHA inspectors are not bound by MSHA's Coal Inspection Manual, as coal mines are regulated according to a distinct set of regulations. (8/11/09 Tr. at 35–36; 8/12/09 Tr. at 81–82).

76. There is no bright-line rule regarding what exactly its inspectors are required to do when they encounter active areas of the mine that are barricaded or "dangered off." Rather, MSHA expects its inspectors to inquire into why the area is barricaded and use their judgment to determine whether the warning sign adequately warns of the danger or whether the barricade sufficiently impedes unauthorized entry into that particular area. Inspectors are not required to physically enter such areas if they believe doing so would endanger their safety or the safety of other members of the inspection party. (8/12/09 Tr. at 13–14, 33–34, 54–55).

77. The area of the mine where the accident occurred was idle at the time Varland conducted his three inspections in 1999 and did not become active until over four months after Varland's last inspection. (Def. Trial Exs. 103, 110, and 126.)

78. At no time did the miners' representative inform Kirk that Varland was failing to inspect all active areas of the mine. (8/11/09 Tr. at 39).

79. Torres, the mine's underground supervisor, accompanied Varland for approximately 95% of the time Varland spent in the underground portion of the mine, and at no time did he ever witness Varland miss or skip over an area of the mine that was active. (8/11/09 Tr. at 7–8).

80. The mine operator did not dictate to Varland where the inspection party should go. Rather, Varland made the determination of where the inspection party was to go. (8/11/09 Tr. at 8).

81. Varland rode in company vehicles in order to get to the area of the mine he wished to inspect. At that point, the inspection party would exit the vehicle and proceed on foot. (8/13/09 Tr. at 7–8).

82. Riding in a mine's vehicles to get to various locations in the mine not only is permissible, doing so is necessary in order to complete an inspection in a reasonable amount of time. (8/11/09 Tr. at 30–31; 8/12/09 Tr. at 53).

83. For each regular inspection, the MSHA inspector is required to note whether the entire mine was inspected and, if not, to explain why. For each of the three inspections conducted by Varland in 1999, he noted in the affirmative that the entire mine was inspected. (Def. Trial Exs. 116, 117, 118, and 119).

84. As Varland's supervisor, Kirk reviewed his inspection reports and found no reason to question that the entire mine

had been inspected. (8/11/09 Tr. at 52, 59, 63, 66–68).

85. Inspections of underground mines are given priority, and at no time did Kirk instruct Varland to conduct a truncated inspection of the mine due to resource constraints. (8/11/09 Tr. at 121–122).

86. Varland was fully aware of his obligation under the Act to inspect all active areas of the mine. Varland determined which areas were active by conferring with management, the miners, and the miners' representative. The mine's production records, which indicate which areas of the mine have been recently worked, also were made available to Varland. Varland inspected all active areas during his inspections in 1999. (Def. Trial Ex. 122 at pg. 33 ln. 23 to pg 39 ln. 13; 8/13/09 Tr. at 6, 56–57).

87. Varland thoroughly inspected the ground conditions at the mine and evaluated the mine's ground control practices during each of his 1999 inspections. Varland spoke with numerous miners to find out whether they had any concerns over the ground conditions at the mine. With the exception of the conversation Varland had with Villanueva during the September 1999 inspection, no miners ever raised any ground control concerns with Varland. On numerous occasions, Varland also asked miners to demonstrate how they tested for loose ground and scaled loose ground to ensure it was being done properly. (8/13/09 Tr. at 8–9; Def. Trial Exs. 117, 118, 119, and 120; Def. Trial Ex. 122 at pg. 26 ln. 24 to pg. 27 ln.19, pg. 54 ln. 4 to pg. 55 ln. 7, pg. 57 ln. 3 to pg. 59 ln. 22, and pg. 164 ln. 2 to ln. 22; Def. Ex. 143 at pg. 190 ln. 4 to pg. 194 ln. 2).

88. Varland also reviewed a ground control study conducted by MSHA in 1997 prior to his first inspection of the mine. (Def. Trial Ex. 122 at pg. 47 ln. 21 to pg. 53 ln. 13, pg. 69 ln. 18 to pg. 73 ln. 25, pg. 83 ln. 18 to pg. 84 ln. 10, and pg. 137 ln. 2 to pg. 138 ln. 17).

89. At the September 1999 inspection, Varland issued a citation to the mine when he observed a miner working under unsupported loose ground. (Def. Trial Ex. 118). There is no evidence to suggest that Varland ever determined that the mine was violating a mandatory safety regulation, but failed to issue a citation.

90. No citations were issued to the mine at the subsequent inspection in November 1999 (not conducted by Varland). (Def. Ex. 120).

## CONCLUSIONS OF LAW

### A. Discretionary Function Exception

1. The FTCA waives sovereign immunity for specified tort actions arising out of the conduct of federal employees. 28 U.S.C. § 2674; *Fang v. United States,* 140 F.3d 1238, 1241 (9th Cir.1998). That waiver, however, is limited. *Id.* Liability cannot be imposed if the tort claims stem from a federal employee's exercise of a "discretionary function." 28 U.S.C. § 2680(a). The question whether the discretionary-function exception bars a particular claim is resolved by applying a two-prong test. *Id.* For the first prong, it must be decided whether the challenged conduct is discretionary, that is, whether it "involv[es] an element of judgment or choice." *Fang,* 140 F.3d at 1241 (citing *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)(inspection of polio vaccines)). "This element is not met 'when a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow.'" *Id.* (quoting *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954). If the act is not discretionary, the government is not immune. *Id.* The second prong, if the challenged conduct is discretionary, it "must

be determined whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954. "Only those exercises of judgment which involve considerations of social, economic, and political policy are excepted from the FTCA by the discretionary function doctrine." *Sigman v. United States,* 217 F.3d 785, 793 (9th Cir.2000). "The primary focus of the second prong of the test is on 'the nature of the actions taken and on whether they are susceptible to policy analysis.' " *Fang,* 140 F.3d at 1241 (quoting *United States v. Gaubert,* 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335(1991)(federal savings and loan regulators)). "When a statute, regulation or agency guideline allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Weissich v. United States,* 4 F.3d 810, 814 (9th Cir.1993) (citing *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267), *cert. denied,* 512 U.S. 1219, 114 S.Ct. 2705, 129 L.Ed.2d 833 (1994).

■ 2. The Federal Tort Claims Act expressly excludes from its application any claim based on an act or omission of a government employee, exercising due care in the execution of a statute or regulation, whether valid or not, or based on the exercise or performance, or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or government employee, whether or not the discretion is abused. *United States v. Varig Airlines,* 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954; *Gaubert,* 499 U.S. at 322–23, 111 S.Ct. 1267; *Alfrey v. United States,* 276 F.3d 557, 561 (9th Cir.2002); 14 *Fed. Prac. & Proc. Juris.3d* § 3658.1 (2006); 35A *Am. Jur.2d* FTCA § 34 (2007).

■ 3. When the discretionary function exception is applicable, it must be applied, even if, through application, it becomes a shield for carelessness and poor judgment. *National Union Fire v. United States,* 115 F.3d 1415, 1422 (9th Cir. 1997), *cert. denied,* 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998).

4. The statute expressly makes mine operators and miners responsible to comply with these standards. 30 U.S.C. § 801(e), 801(g)(2). Under regulations particularly pertinent here, mine operators are required to provide adequate ground support in underground mines. 30 C.F.R. § 57.3360. The regulations also require mine operators to examine and test ground conditions "in areas where work is to be performed, prior to work commencing, after blasting, and as ground conditions warrant during the work shift." 30 C.F.R. § 57.3401. Mine operators are likewise required to eliminate any hazardous ground conditions. Id. § 57.3200.

5. The regulations most pertinent to this case state in relevant part: (1) "Ground conditions that create a hazard to persons shall be taken down or supported before other work or travel is permitted in the affected area." 30 C.F.R. § 57.3200; (2) "Ground support shall be used where ground conditions, or mining experience in similar ground conditions in the mine, indicate that it is necessary." 30 C.F.R. § 57.3360; and (3) "Persons experienced in examining and testing for loose ground shall be designated by the mine operator. Appropriate supervisors or other designated persons shall examine and, where applicable, test ground conditions in areas where work is to be performed, prior to work commencing, after blasting, and as ground conditions warrant during the work shift." 30 C.F.R. § 57.3401. There is no statute or regulation that specifically states when artificial ground support is

necessary or the particular method of ground control that must be used. Nor is there a statute or regulation that forbids, requires permission to use, or even addresses any particular type of mining at an underground non-coal mine.

■ 6. Mine inspections are protected by the discretionary function exception, even if, in hindsight, it appears that an inspector should have exercised his discretion differently or, when faced with similar circumstances in subsequent inspections, actually did exercise his discretion differently. *See Varig Airlines,* 467 U.S. at 818–20, 104 S.Ct. 2755; *GATX/Airlog Co. v. United States,* 286 F.3d 1168, 1178–79 (9th Cir.2002); *see also Estate of Bernaldes v. United States,* 81 F.3d 428, 429 (4th Cir.1996); *Cassens v. St. Louis River Cruise Lines, Inc.,* 44 F.3d 508, 513–16 (7th Cir.1995); *Cunningham v. United States,* 786 F.2d 1445, 1447 (9th Cir.1986); *Hylin v. United States,* 755 F.2d 551, 553 (7th Cir.1985); *Russell v. United States,* 763 F.2d 786, 787 (10th Cir.1985); *Bernitsky v. United States,* 620 F.2d 948, 955 (3d Cir.1980). *See Shansky v. United States,* 164 F.3d 688, 695 (1st Cir.1999) ("An agency that has discretion to make policy choices can change its view as to the proper balance of relevant concerns as time passes and experience accrues.").

■ 7. The discretionary function exception only shields the government from liability if the action at issue:(1) involves an "element of judgment or choice"; and (2) is grounded in "social, economic, or political policy." *Terbush v. United States,* 516 F.3d 1125, 1129 (9th Cir.2008); *see Berkovitz,* 486 U.S. at 536–37, 108 S.Ct. 1954. The government bears the burden of proving that the discretionary function exception applies to *each* allegedly negligent act. *See GATX/Airlog Co. v. United States,* 286 F.3d at 1174.

■ 8. The actions of MSHA inspectors and supervisors were the result of properly delegated power to exercise discretion. There was no gross negligence, intentional wrongdoing or criminal conduct.

9. There was no mandatory directive that Kirk or Varland failed to follow. Any internal guidance does not rise to that level, but may well be the underlying basis for a personnel disciplinary action.

10. When Kirk got the anonymous complaints and found them extremely vague, he was confronted with a decision: send out a team to inspect the entire mine and try to pinpoint the source of the complaint or instigate an inspection sooner rather than later with what information he had. This was a decision that involved an economic balance: money/ time vs safety concerns. He engaged in discretionary decisionmaking that he was afforded the power and authority to do. Even if he made a decision that internally others disagreed with, hence the disciplinary action, it fell within the discretionary decisionmaking rubric. *Terbush,* 516, F.3d at 1129–1130; *National Union Fire Ins.,* 115 F.3d at 1422; *Reed v. United States,* 231 F.3d 501 (9th Cir.2000), *cert. denied,* 532 U.S. 1019, 121 S.Ct. 1957, 149 L.Ed.2d 753 (2001). Whether or not to act on an anonymous written and oral complaint was susceptible to policy analysis, particularly when Kirk deemed the complaints vague and nondescriptive of the problem such that it would require a total mine inspection—he had to and did consider the economic ramifications balanced with the safety concerns. *Kennewick Irrigation District v. United States,* 880 F.2d 1018, 1027–28 (9th Cir. 1989). Whatever the policies are after-the-fact, if they change or are refined, are irrelevant. Kirk weighed and balanced the issues and the decision. Varland had the same latitude for weighing and balancing,

but ultimately followed procedures in place to inspect the mine.

11. A coal mining manual of procedures does not apply to copper mining.

12. MSHA's interpretation of the Act, which is entitled to deference, is not clearly erroneous. Requiring mine inspectors to go into areas of the mine that are abandoned, idle, or otherwise present hazardous conditions that have yet to be abated would be logistically impossible and would unnecessarily subject them and other members of the inspection party to danger.

■ 13. An agency's interpretation of its statutes and regulations is protected by the discretionary function exception.

■ 14. Varland fulfilled his duty to inspect the entire mine during each of his three inspections in 1999.

15. Because the area of the mine where the accident occurred was idle during Varland's inspections, Varland had no duty under the Act to inspect that particular area.

16. Varland had no mandatory duty to take any sort of enforcement action against the mine based on the ground conditions at the mine or its chosen methods for controlling the ground. Varland's determinations as to whether the company was in compliance with the applicable safety regulations are protected by the discretionary function exception.

17. The manner in which Varland conducted his inspections of the mine is protected by the discretionary function exception.

## B. Restatement of Torts 2d, Section 324A(c)

■ 18. Section 324A provides:

One who undertakes, gratuitously or for consideration, to render services to an-other which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise . reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Arizona courts treat both the undertaking to render services that imposes a duty and the subsections necessary to establish liability as factual inquiries. *See Diggs v. Arizona Cardiologists, Ltd.*, 198 Ariz. 198, 8 P.3d 386 (Ariz.App.2000).

■ 19. The Ninth Circuit concluded that Kirk's evaluation and Varland's inspection constitute an undertaking to render services and that issues of material fact remained as to whether the miners' reliance was sufficient to trigger liability under 324A(c). (Ninth Circuit Memorandum Opinion at 6 (No. 07–17115, Dec. 9, 2009.))

■ 20. Plaintiff bears the burden of proof on the reliance issue.

21. The miners did not rely on MSHA as a service rendered, because the miners had no knowledge of the anonymous letter or the anonymous calls made to Kirk.

22. The Act makes the mine operator responsible for compliance with the health and safety regulations. *See* 30 U.S.C. §§ 801(e), (g)(2), 803.

23. Plaintiffs have not established that MSHA assumed the duty to comply with the safety and health regulations that Asarco owed its miners. *Myers v. United States*, 17 F.3d 890, 903 (6th Cir.1994)

("The inspections performed by MSHA are for the purpose of ensuring that [the mine owner] and the miners comply with their duties, not for the purpose of relieving them of those duties."); *Raymer v. United States*, 660 F.2d 1136, 1143–44 (6th Cir. 1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982); *Ayala v. United States*, 49 F.3d 607, 612–13 (10th Cir.1995).

24. Plaintiffs have not established reliance under section 324A(c) of the Restatement. Arizona law has specifically recognized the principle, as expressed in Restatement § 324A cmt. e, that for detrimental reliance to exist, the reliance must have induced the miners to forego other remedies or precautions against the risk. *See Diggs v. Ariz. Cardiologists, Ltd.*, 198 Ariz. 198, 8 P.3d 386 (Ariz.App. 2000); *Tollenaar v. Chino Valley Sch. Dist.*, 190 Ariz. 179, 945 P.2d 1310 (Ariz. App.1997). This principle has been uniformly applied by federal courts when interpreting this provision of the Restatement. *See, e.g., Myers*, 17 F.3d at 903; *Good v. Ohio Edison Co.*, 149 F.3d 413, 421 (6th Cir.1998); *Patentas v. United States*, 687 F.2d 707, 717 (3rd Cir.1982); *Clemente v. United States*, 567 F.2d 1140, 1145 (1st Cir.1977).

25. Moreover, "reliance on the inspection in general is not sufficient. Instead, the reasonable reliance must be based on specific actions or representations which cause the persons to forego other alternatives of protecting themselves." *Turbe v. Virgin Islands*, 938 F.2d 427, 431 (3d Cir.1991); *accord Howell v. United States*, 932 F.2d 915, 919 n. 5 (11th Cir.1991) (general knowledge that inspections occur not enough to establish reliance).

26. The miners have not demonstrated reliance because they did not forego workplace inspections or other safety precautions they otherwise would have taken on the belief that Varland's inspections of the mine rendered such inspections and precautions unnecessary.

27. The miners have not demonstrated reliance under section 324A(c) of the Restatement (Second) of Torts because they did not forego the workplace inspections or other safety precautions they otherwise would have taken on the belief that MSHA had investigated the anonymous complaints.

## ORDER

Based on the foregoing,

IT IS ORDERED that this action is dismissed for lack of federal subject matter jurisdiction.[3] Fed.R.Civ.P. 12(b)(1). Each party is to bear their own attorney fees and costs. A Final Judgment shall enter separately.

---

3. There are no motions pending from the original order entered by this Court. The Court granted the Motion to Dismiss and granted the Motion for Summary Judgment only as it went to the constructive fraud claims, leaving the remainder of the motion for summary judgment moot, based on the granting of the motion to dismiss for lack of federal subject matter jurisdiction. If this was unclear, a motion to clarify or correct the Order should have been filed a long time ago. Defendant is incorrect that there is a pending motion for summary judgment on the merits.